**Michael L. AGEE, Plaintiff,**

**v.**

**PARAMOUNT COMMUNICATIONS, INC., et al., Defendants.**

**No. 93 Civ. 6348 (CBM).**

United States District Court, S.D. New York.

June 3, 1994.

John Walshe & Associates, John Walshe, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, Arthur L. Liman and Leslie Gordon Fagen, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiff Michael L. Agee ("Agee") has brought this copyright infringement action under the Federal Copyright Act, 17 U.S.C. § 101, *et. seq.* ("the Copyright Act"). This court has jurisdiction over this action based on 28 U.S.C. §§ 1331, 1338(a) and 1338(b). The complaint alleges that defendants Paramount Communications, Inc., Paramount Pictures, and Paramount Television Group (collectively referred to as "Paramount") and 108 owners of 129 television stations located

throughout the United States ("TV defendants") infringed his sound recording copyrights in two Laurel & Hardy musical recordings in connection with their broadcast of the "Hard Copy" television program on February 16, 1993.

Defendants have moved for summary judgment and for dismissal of the complaint pursuant to Rules 12(b) and 56(b) of the Federal Rules of Civil Procedure. Plaintiff has cross-moved for the disqualification of defense counsel in their representation of the TV defendants. The court heard oral argument on plaintiff's disqualification motion on December 17, 1993 and defendants' summary judgment motion on January 28, 1994. For the reasons set forth below, plaintiff's motion is denied and defendants' motion is granted.

### FACTS

Plaintiff Michael Agee, a California resident, is the owner of L & H Records, a music recording studio located in Garden Grove, California. Through L & H Records, Agee owns copyrights in two sound recordings, "Laurel and Hardy's Music Box" ("Music Box") and "Laurel and Hardy's Music Box—Volume Two" ("Music Box–Two"). The music was written by Ronnie Hazelhurst and was first published in 1986 and 1990. Plaintiff does not own the copyrights or the publishing rights to the music compositions. Comp. ¶¶ 3, 6.

Defendant Paramount Communications, Inc. is a Delaware corporation whose principal place of business is Los Angeles, California[1]. Defendants Paramount Pictures and Paramount Television Group are divisions of Paramount Communications, Inc. Paramount Pictures produces the "Hard Copy" television program which is the subject of the instant action. Comp. ¶ 4.

"Hard Copy" is a daily, half-hour news magazine program produced and transmitted by Paramount to independently-owned and operated television stations over the country for broadcast each weekday. The program is created and produced in Los Angeles, California. Pursuant to a licensing agreement between Paramount and the television stations, each installment of "Hard Copy" is a single broadcast, transmitted by Paramount Pictures by satellite to all the local television stations for broadcast on the same day.[2] Comp. ¶ 9; Ex. A to the Affidavit of Richard A. Kurshner ("Kurshner Aff."), ¶ 3–7.

The essence of plaintiff's complaint centers on the February 16, 1993 "Hard Copy" broadcast. Plaintiff complains that defendants' unauthorized use of his sound recordings during the "Caught on Tape" segment of that broadcast infringed his sound recording copyrights in "Music Box" and "Music Box–Two." Comp. ¶ 10.

"Caught on Tape" is an occasional feature of "Hard Copy" that shows security camera videotapes of actual crimes while they are being committed. The "Caught on Tape" segment aired on February 16, 1993 showed two young men unsuccessfully attempting to burglarize a liquor store in Houston, Tx. The segment was approximately four minutes in length and was the first feature story of the broadcast. Portions of the songs "Ku-Ku" and "Cops" from "Music Box–Two" were used as background music to accompany the

1. Plaintiff claims that Paramount maintains its principal place of business in New York. Comp. ¶ 4. The court finds, however, based upon the evidence submitted by defendants, that Paramount Pictures, the division that produces "Hard Copy," is located in California, produces the program in California, and transmits the program via satellite to the television stations from California. Kurshner Aff., ¶ 3–4. Moreover, the television license agreements between Paramount and each station are executed in California and expressly provide that the contract shall be governed by California law. *Id.* at Ex. A; B, ¶ 15(e). Accordingly, Paramount's principal place of business for purposes of this action is California.

2. According to defendant, Paramount tapes the program in California on the day of broadcast and at approximately 12:00 noon Pacific Time, Paramount transmits that day's program by satellite to all the local television stations. The satellite is a common carrier and Paramount leases the satellite time necessary to transmit the program. When Paramount transmits the program, each television station receives the satellite signal and records the program for broadcast later that same day. The television stations then broadcast "Hard Copy" according to their own program schedules and time zone requirements on the day they receive the satellite signal. The stations cannot rebroadcast the program at any other time. Kurshner Aff., ¶¶ 3–7.

visual images. Comp. ¶¶ 10–11; Pl.'s Ex. A. Paramount claims that the compact disc containing plaintiff's sound recordings was purchased from a record store by an employee of Paramount Pictures. Kurshner Aff., ¶ 9–10.

The "Caught on Tape" segment was prerecorded on February 15, 1993. At that time, portions of the Laurel and Hardy songs were transferred onto the audio track of the segment. The "Caught on Tape" segment was integrated into "Hard Copy" on the day of broadcast and a brief portion of the segment was used during the opening credits of the program. A promotional commercial for the February 16 show was also produced on February 15 which contained twenty seconds of the "Caught on Tape" segment. The commercials were transmitted by satellite on February 15 and broadcast by the television stations prior to the February 16 broadcast. Kurshner Aff., ¶ 10.

Plaintiff alleges that the unauthorized use of his Laurel & Hardy sound recordings as theme music for the "Caught on Tape" segment of the February 16 edition of "Hard Copy" infringed his copyright. More specifically, Agee claims that Paramount "wilfully infringed [his] performances of [his sound recording] copyrights by purchasing copies of his audio recordings "Music Box" and "Music Box–Two" in a record store and copying and synchronizing, without authorization, the performances of the musical arrangements fixed in those recordings...." Comp. ¶ 10. Plaintiff additionally alleges that by adding his sound recordings to their audiovisual images, defendants "infringed [his] copyright[s] by preparing a derivative work" in violation of § 114(b)(2) of the Copyright Act. Pl.'s Memo. Opp. Def.'s Motion for Summ. J. and Dismissal at 1. As a result of "this unfair competition by defendants," plaintiff has allegedly suffered a "loss of goodwill affecting the future licensing value of the infringed songs." Comp. ¶ 35. Thus, plaintiff seeks compensatory and punitive damages and a permanent injunction preventing defendants from rebroadcasting the February 16 program and committing similar acts in the future.

Defendants, on the other hand, argue that plaintiff is not entitled to relief because their use of the sound recording did not infringe plaintiff's exclusive rights under the Copyright Act. Paramount claims that its use of the Laurel & Hardy sound recordings during the February 16 installment of "Hard Copy" constituted a "performance," which is an exclusive copyright not available to sound recording copyright owners under the Copyright Act. Def.'s Memo. Sup. Summ. J. at 2. Defendants also argue that their use of plaintiff's sound recordings as background music in the "Hard Copy" television program did not create a derivative work. For the reasons stated below, the court finds that plaintiff's complaint should be dismissed and defendants are entitled to summary judgment as a matter of law.

## I. Plaintiff's Disqualification Motion

■ Before deciding the issues raised in defendants' summary judgment motion, it is first necessary to address plaintiff's application for the disqualification of defense counsel. Plaintiff requests that this court disqualify the law firm of Paul, Weiss, Rifkind, Wharton and Garrison ("Paul Weiss") from representing the TV defendants "because of their conflict in representing defendants with adverse positions." Declaration of John Walshe in Support of Pl.'s Mot. to Disqualify, ¶ 1. According to plaintiff, since "108 [TV defendants] did not choose defense counsel and had no input in that choice," there exists a "clear, unavoidable and insoluble conflict between the interests of the Paramount defendants ... and the rights of the TV defendants." Id.; Pl.'s Memo. Supp. Mot. to Disqualify Defendants' Counsel at 1.

■ Courts have long recognized the need to protect the integrity of the attorney-client relationship in circumstances where a perceived conflict of interest arises. See, Bonin v. California, 494 U.S. 1039, 1040, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990) (Marshall, J., dissenting) ("[i]t is well established that the right to effective assistance of counsel carries with it a correlative right to representation that is free from conflicts of interest"); Board of Ed. of City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir.1979) (trial judges have the power to disqualify counsel

where necessary to preserve the integrity of adversary actions before them). A conflict of interest between clients can potentially compromise a lawyer's duty to serve each client with undivided loyalty, as well as to deter the attorney from exercising independent, professional judgment on behalf of each client. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976).

■ Contrasted against the court's duty to protect the integrity of the trial proceeding, however, is its desire to respect the client's interest in selecting and retaining counsel. Generally, courts have expressed reluctance in granting disqualification motions because of their concerns regarding: (1) the "immediate adverse effect disqualification has on the client separated from his lawyer;" (2) "the desire to preserve, to the greatest extent possible, ... the individual's right to be represented by counsel of his or her choice;" and (3) "the awareness that disqualification motions are being made, with increasing frequency, with purely strategic purposes in mind." *Vegetable Kingdom, Inc. v. Katzen*, 653 F.Supp. 917, 921 (N.D.N.Y.1987) (*citing Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979); *Hull v. Celanese Corp.*, 513 F.2d 568, 569 (2d Cir.1975)).

■ Giving full consideration to these competing interests, motions to disqualify counsel should be subjected to heightened scrutiny. Accordingly, the moving party bears a "heavy burden of proving [the] facts required for disqualification." *Evans v. Artek Systems Corp.*, 715 F.2d 788, 794 (2d Cir.1983); *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

■ The American Bar Association Model Code of Professional Responsibility ("Model Code") contains many disciplinary rules ("DRs") that clarify the attorney-client relationship. As plaintiff stated in his motion, the relevant rule governing conflicts of interest is DR 5–105, Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.[3] Under DR 5–105, an attorney must generally disqualify himself and cease from representing multiple clients in cases where (1) the exercise of the attorney's independent professional judgment will be or is likely to be adversely affected by representing another client; or (2) the attorney is representing parties who have differing interests. Merely representing multiple clients who have similar interests in seeking joint representation does not automatically impair effective assistance of counsel or constitute a violation of DR 5–105. *United States v. Curcio*, 680 F.2d 881, 884–86 (2d Cir.1982).

It is undisputed that plaintiff has never been represented by defense counsel in this or any other matter. Instead, plaintiff argues that "[Paramount's] retention of one counsel, ... for themselves and for all the 108 TV defendants raises the concern that the TV defendants will be denied proper representation with regard to interposing crossclaims [sic] against [Paramount] for any punitive or actual damages imposed as well as asserting defenses critical of the role [Paramount] had in the infringements, since one firm cannot simultaneously defend both [Paramount's] acts and seek to assert cross claims [sic] against [Paramount] for those acts." Pl.'s Memo. Supp. Mot. to Disqualify Defendants' Counsel at 12.

---

3. DR 5–105 provides, in relevant part:
   (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).
   (B) A lawyer shall not continue multiple employment if in the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).
   (C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Under Paragraph 8 of the licensing agreement between Paramount and the TV defendants, Paramount agreed to "indemnify and hold Licensee [i.e., the TV defendant], its officers, employees, successors and assigns free and harmless from any and all claims, damages, liabilities, costs or expenses, including reasonable attorney's fees, incurred by Licensee by reason of the breach of [its warranty that it obtained the necessary rights to telecast 'Hard Copy']." Kurshner Aff., Ex. A. Paramount further agreed to "defend at its own expense any claim, action or proceeding arising out of an alleged breach of the foregoing warranty," provided the TV defendants delegated such authority to Paramount and fully cooperated with them in defending any actions which might arise. *Id.*

From this language, the court finds that the parties fully anticipated long before this action was brought that infringement claims might arise in connection with the broadcast of "Hard Copy" and in those circumstances, Paramount would incur the costs of defending the TV stations as well as indemnify them for any potential expenses which they might incur. To support this understanding, defendants have offered as evidence letters from Paramount to the TV stations informing them of plaintiff's claims and its obligations to the stations under the licensing agreement. Exhibits D & E to the Affidavit of Robert A. Atkins In Opposition to Disqualification ("Atkins Aff."). Defendant has further offered several letters written by some of the TV stations directly to plaintiff's counsel informing him of the indemnity agreement and their decision to delegate their defense to Paramount's counsel. Atkins Aff., Exs. A & B. This directly contradicts plaintiff's allegations that defense counsel was not authorized by the TV defendants.[4]

Moreover, while plaintiff would have us believe that some future conflict might arise as a result of this representation, the court views his contentions as a mere smokescreen to cloud the common interest of the defendants in this case. Clearly, if the defendants were found liable under the Copyright Act, Paramount must indemnify each of the television station owners in addition to paying its own allocated share of the costs. Moreover, regardless of the outcome of the case, Paramount would be required under the license agreement to reimburse the TV defendants for reasonable attorney's fees. There are no adverse interests in this case and there is no confidential information that would unfairly impair defense counsel's representation of any party. Paramount is ultimately liable regardless of whether the TV stations are represented by Paul, Weiss or their own attorneys and it is precisely because of this mutual interest that defendants have selected one law firm to represent them.

Plaintiff has presented no evidence that an actual conflict of interest exists in this case. Furthermore, the court finds no evidence that Paul Weiss' independent professional judgment would be impaired by representing multiple defendants. Accordingly, plaintiff's motion is denied.

## II. Defendants' Summary Judgment Motion

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the mov-

---

4. For example, plaintiff concedes that the Second Circuit is highly skeptical of disqualification motions, but argues that we should not be influenced by established precedent because "there is no indication that [Paul, Weiss was] chosen by the TV defendants." While he urges that every indication should lead us to conclude that Paul Weiss was *not* chosen by the TV defendants, he has failed to produce any evidence suggesting that a television station ignored the provisions of ¶ 8 of the licensing agreement and insisted on its own representation. Furthermore, although plaintiff has served every TV defendant with a copy of the complaint, not one television station has raised an objection to defense counsel with this court.

ing party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the movant has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510; *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). At that point, the court must determine whether the evidence presents a "genuine factual issue[ ] that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Based upon the evidence submitted by the parties on defendants' motion, there are no genuine issues of material fact. Accordingly, defendants are entitled to summary judgment as a matter of law.

### *Copyright Statutes and Burden of Proof*

■  The Copyright Act of 1976, 17 U.S.C. §§ 101–810 (1993), provides certain legally-protected rights for copyrights owners. As previous courts have held, the principal purpose of the Act is to encourage the origination of creative works by attaching enforceable property rights to them. *Diamond v. Am–Law Pub. Corp.,* 745 F.2d 142, 147 (2d Cir.1984).

In the musical genre, the Act distinguishes between written musical works and sound recordings in defining the exclusive copyright protection available. For instance, those individuals holding a copyright for written music such as songwriters and music publishers possess the following exclusive rights under § 106 of the Act:

(1) the right to reproduce the copyrighted work in copies or phonorecords;

(2) the right to prepare derivative works based upon the copyrighted work;

(3) the right to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or, lending;

(4) [the right] to perform the copyrighted work publicly; and

(5) [the right] to display the copyrighted work publicly.

17 U.S.C. § 106(1)–(5) (1993).

On the other hand, § 114(b) of the Act limits the rights available to entities holding a copyright in a sound recording.[5] Sound recording copyright holders possess only three exclusive rights:

(1) [t]he right to duplicate the sound recording in the form of phonorecords, or of copies of motion pictures and other audiovisual works, that directly or indirectly recapture the actual sounds fixed in the recording;

(2) [t]he right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality; and

(3) [the right] to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or, lending.

17 U.S.C. § 114(b) (1993).

The Act makes clear that the owners of sound recording copyrights do not possess "any right of performance under § 106(4)." 17 U.S.C. § 114(a) (1993). Based upon the pleadings and evidence submitted by both parties, this court finds as a matter of law that defendants' use of plaintiff's sound recording has not infringed any of his exclusive rights under the Copyright Act.

### *Paramount's recording did not infringe plaintiff's exclusive right to reproduce or distribute his sound recording*

■  Plaintiff claims that Paramount infringed his copyright by failing to obtain a synchronization license (or "sync" license) before reproducing his sound recordings in the "Hard Copy" program. According to plaintiff, by "synchronizing" the Laurel and Hardy sound recordings with the visual images in the "Caught on Crime" segment, defen-

---

**5.** Under the Copyright Act, a "sound recording" is defined as a work resulting from "the fixation of a series of musical, spoken, or other sounds ..." 17 U.S.C. § 101 (1993).

dants infringed his sound recording copyrights in those works. Tr. 33–33, Pl. Memo. Opp. Summ. J. at 7.

It is a common practice in the television industry to use music in television programming. When producing a television program, a producer can opt to use "inside music" which is originally arranged by a composer or "outside music" such as pre-existing sound recordings. Moreover, the producer may choose to use theme music to introduce or close a program, background music to accompany or complement the visual action, or feature music which becomes the primary focus of the audience's attention. *Buffalo Broadcasting v. American Soc. of Composers,* 744 F.2d 917, 921 (2d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985); *National Cable Television v. Broadcast Music,* 772 F.Supp. 614, 619 (D.D.C.1991).

█ The synchronization process usually occurs when background music is used to accompany a visual image, such as a motion picture or audiovisual work. If the television producer uses "outside music" to accompany the program, he must obtain a performing license as well as a synchronization license. Performing licenses, which can only transfer copyrights owned by music publishers and music composers, can be obtained from either the American Society of Composers, Authors and Publishers ("ASCAP") or Broadcast Music, Inc. ("BMI"). *Columbia Broadcasting System, Inc. v. American Society of Composers, et al.,* 400 F.Supp. 737, 741–42 (S.D.N.Y.1975), *rev'd,* 562 F.2d 130 (2d Cir.1977), *rev'd,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Alternatively, the producer can obtain a license which jointly confers performance and synchronization rights through the Harry Fox Agency, Inc. *National Cable Television Ass'n, Inc. v. Broadcast Music, Inc.,* 772 F.Supp. 614, 633–34 (D.D.C.1991); *Nimmer on Copyright,* § 8.19 at 8–265.

While the synchronization right is recognized in current copyright jurisprudence, *Buffalo Broadcasting,* 744 F.2d at 921, the Copyright Act does not expressly confer a "synchronization right" on either music copyright owners or sound recording copyright owners. As a result, plaintiff's alleged "synchronization right" must be derived from one of the exclusive rights available to sound recording copyright owners under the Copyright Act. In the case of music composers and music publishers, courts have found that the synchronization right is derived from the copyright owner's exclusive right to reproduce his work. As the District Court stated in *Angel Music, Inc. v. ABC Sports, Inc.,* 631 F.Supp. 429, 433 n. 4 (S.D.N.Y.1986),

> "Synchronization rights," or the use of music in synchronization with visual images on a soundtrack of a film or videotape, are a subset of the larger category of reproduction rights granted to music publishers under the Copyright Act, 17 U.S.C. § 106(1) and are a category of rights qualitatively distinct from the performance rights in 17 U.S.C. § 106(4).

*See also, M. Witmark & Sons v. Jensen,* 80 F.Supp. 843, 844 (1948) ("[t]he licensing agreements covering synchronization seem to vary in form, but all of them specifically indicate that the rights granted are recording rights alone and do not extend to performance rights of the copyrighted music").

The Copyright Act does confer an exclusive right of reproduction upon sound recording copyright owners. However, that right is more limited than the broad right of reproduction granted music composers and music publishers under § 106(1). Under § 114(b)(1), the exclusive right of reproduction for sound recording copyright owners is limited to the right to duplicate the sound recording in the form of phonorecords, or of 'copies' of audiovisual works, that directly or indirectly recapture the actual sounds fixed in the recording. Although the statute does refer to sound recordings contained in audiovisual works, the court does not construe this language to automatically confer the synchronization right on sound recording copyright owners. Accordingly, since the federal statute is ambiguous, it is necessary to review the legislative history of the Act in order to obtain further guidance on this complex issue. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (where the resolution of a question of federal law turns on a statute and the intention of Congress, courts must first look to the statu-

tory language and then to the legislative history if the statutory language is unclear).

■ "The ability of the owner of a [sound recording] to maintain the exclusive right to reproduce it for public distribution is the economic key to the sound recording industry." Sidney A. Diamond, *Sound Recordings And Phonorecords: History And Current Law*, 2 U.Ill.L.Rev. 337, 345 (1979).[6] Reviewing the legislative history of § 114 and its predecessor in the Sound Recording Act of 1971, it is evident that Congress's intention in granting the exclusive right of reproduction was to prevent the unauthorized duplication of commercial sound recordings, i.e., record piracy, which was causing substantial losses in the recording industry. *See United States v. Taxe*, 380 F.Supp. 1010, 1014 (C.D.Cal.1974), *aff'd*, 540 F.2d 961 (9th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977) ("The legislative history" of the 1971 Act indicates that its intent was to put record "pirates" out of business.) As stated in the House Report on the Sound Recording Act of 1971, Congress enacted the legislation to prevent "widespread unauthorized reproduction of phonograph records and tapes."[7] H.R.Rep. No. 487, 92nd Cong., 1st Sess. at 1 (1971) *reprinted in*, 1971 U.S.C.C.A.N. 1566, 1577. This intent is reflected in the Copyright Act, which incorporated the primary elements of the Sound Recording Act, including the right to reproduce sound recordings. *See*, Diamond, *supra*, at 354–55.

■ Considering the language of the Copyright Act and its underlying legislative

history, the court finds that to confer a synchronization right on plaintiff in this case would extend his rights far beyond what Congress intended. By specifically proscribing "copies" of audiovisual works or motion pictures containing sound recordings, this court finds that the mere process of synchronizing a sound recording to a video image alone does not infringe plaintiff's rights to commercially reproduce his recording. In other words, his reproduction rights could only be infringed by the *unauthorized sale or public distribution* of video tapes, phonorecords, audio cassettes or compact discs containing his sound recordings to the general public, which did not happen in this case. Paramount's taping of the Laurel and Hardy sound recordings on its television program *did not prevent plaintiff from selling* "Music Box" or "Music Box–Two" to the public nor did it interfere with his sales. Paramount did not reproduce "Hard Copy" for public sale; it merely transmitted a "performance" of the recording included within the "Hard Copy" television program to the television stations. Moreover, as plaintiff concedes, sound recording copyright owners do not possess performance rights under the Copyright Act. Thus, Paramount's use of the sound recording did not infringe Agee's limited right of reproduction under the Copyright Act.

### Paramount's use of plaintiff's sound recordings did not create a derivative work under the Copyright Act

■ It is undisputed that Paramount used plaintiff's sound recording as a back-

---

6. After extensively researching the legislative history of the Sound Recording Act of 1971 and the Copyright Act of 1976, the author further explained:

> The profitability of unauthorized duplications of sound recordings has attracted the technical ingenuity of "pirates" from the earliest days of the recording industry. The unauthorized duplicator avoids the original costs of the recording, including studio expenses, payments to performing artists, and royalties to copyright owners of the musical or other works embodied in the recording. In addition, the unauthorized duplicator naturally selects only "hit" records and thus need not absorb the losses on unsuccessful releases that are a constant financial burden on the legitimate sound recording production company. The pirated produce therefore can be sold at a high profit margin.

7. The following comments made to the Hon. Emanuel Cellar, Chairman of the Committee on the Judiciary, which proposed the Act shed further light on the purpose for the legislation:

> The recent and growing increase in the unauthorized duplication of legitimate commercial recordings has become a matter of public concern both in this country and abroad. The widespread availability and use of phonograph record and tape-playing machines, ... give added impetus to piracy of sound recordings. This trend is certain to continue and to grow unless effective legal methods to combat and reverse it are provided.

H.R. No. 487, 92nd Cong., 1st Sess. at 6, *reprinted in* 1971 U.S.C.C.A.N. at 1576 (comments of David M. Abshire, *Asst. Secretary for Congressional Relations*).

ground musical accompaniment to an audiovisual segment of its television program. However, according to plaintiff, "significantly more than simply broadcasting of the song was done." Tr. 18. Instead, Agee claims that Paramount "lifted it, [ ] stuck it on the film, [ ] put on sound effects, ... and they put the voice-over on, and therefore created a new work which is known as a derivative work." Tr. 20.

Section 101 of the Copyright Act defines a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement ... sound recording, ... or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101 (1993). Moreover, under § 114(b), the use of a sound recording qualifies as a derivative work only if the "actual sounds fixed in the [ ] recording are rearranged, remixed, or otherwise altered in sequence or quality."

■ The essential ingredient in the mix of factors which we must consider in reaching our decision is the originality of the new work. In *L. Batlin & Son, Inc. v. Snyder,* the Second Circuit set the standard for originality as applied to a derivative work by finding that "the work [must] contain some substantial, not merely trivial originality." 536 F.2d 486, 490 (2d Cir.1976) (en banc), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). The court further found that "[o]riginality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying." *Id.*

In *Woods v. Bourne Co.,* 841 F.Supp. 118 (S.D.N.Y.1994), the District Court decided the novel issue of whether any musical additions or variations to the preexisting melody and lyrics of a song resulted in a derivative work that was entitled to copyright protection. In order to qualify as a musically derivative work, the court found that "there must be present more than mere cocktail

pianist variations of the piece that are standard fare in the music trade by any competent musician. There must be such things as unusual vocal treatment, additional lyrics of consequence, unusual altered harmonies, novel sequential uses of theme—something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. *Id.* at 121. Most importantly, the court determined that a derivative work must be "substantially a new and original work, not a copy of a piece already produced, with additions and variations, which a writer of music with experience and skill might readily make." *Id.* at 122 (quoting *Fred Fisher, Inc. v. Dillingham,* 298 F. 145, 148 (S.D.N.Y. 1924)).

Plaintiff has offered no evidence that defendant used his sound recording to create a "new and original work." To the contrary, it appears to this court that defendant merely copied his original sound recordings onto their audiovisual work as a background accompaniment. The entire "Caught on Tape" segment lasted for approximately four minutes and plaintiff's sound recordings were not a prominent focus of the story. In fact, plaintiff's sound recordings were barely audible during the "voice-over" segments where the commentator described the burglers' actions. Moreover, while plaintiff claims that Paramount added sound effects [8] to his music, the court finds that these "sound effects" were merely used to highlight the burglers' actions and did not alter or enhance plaintiff's sound recordings in any way. Pl.'s Ex. 1.

■ Paramount's production of "Hard Copy" is clearly original. However, the court is simply unable to conclude that Paramount's re-recording of plaintiff's sound recordings onto its audiovisual work as background music created a new derivative work that warrants copyright protection. *See Taxe,* 380 F.Supp. at 1013 ("[t]he re-recording of a previously fixed song cannot meet the originality requirements" necessary to constitute a derivative work). Plaintiff has

---

8. More specifically, plaintiff claims that Paramount added sound effects to his sound recordings such as "barroom stuff" and "crashing sounds." Tr. 20.

offered no evidence that the sounds in his recording were remixed, or that additional lyrics or musical variations were added, or that defendant took his recording and transformed it into a new original work. Paramount merely re-recorded Agee's sound recordings onto a TV program—a common practice which we see every day on television programs and commercials and we hear on radio broadcasts. Yet, despite such common occurrences, plaintiff is unable to locate one single case proscribing defendants' actions.[9] As a result, this court holds that copying a sound recording for use in a broadcast television program does not create a derivative work which warrants protection under the Copyright Act of 1976. Accordingly, defendants are entitled to summary judgment as a matter of law.

### The TV Defendants' broadcast of plaintiff's sound recordings are protected under the "Ephemeral Recording" exemption of the Copyright Act

■ The complaint additionally alleges that Paramount infringed plaintiff's copyrights by "broadcasting, or otherwise transmitting to the [TV defendants] the songs as promotional advertisements to exploit the "Hard Copy" television program. Comp. ¶ 12.

■ In this case, Paramount, a network television broadcaster, transmitted the Hard Copy program including plaintiff's sound recordings to approximately 129 television stations which in turn transmitted the program to their respective viewing audiences. As several courts have held, when a network broadcaster or a television station broadcasts a copyrighted work, this transmission constitutes a performance under the

Copyright Act. *See e.g., Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 398, 88 S.Ct. 2084, 2088, 20 L.Ed.2d 1176 (1968) ("[b]roadcasters perform"); *Coleman v. ESPN, Inc.,* 764 F.Supp. 290, 294 (S.D.N.Y.1991) ("[t]transmissions by a cable network or service to local cable companies who in turn transmit to individual cable subscribers constitute "public performances" by the network"); *Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Services,* 746 F.Supp. 320, 328–29 (S.D.N.Y.1990) (court rejects cable network's argument that by transmitting its programming to cable operators who in turn relay the signal to their television viewers is not a public performance). Since sound recording copyright owners do not possess "performance rights" under the Copyright Act, there is no way Paramount's satellite transmission could infringe plaintiff's copyright.[10]

■ Likewise, the "Hard Copy" broadcast by the television stations to the viewing public constituted a performance that could not infringe plaintiff's sound recording copyrights. Paramount's satellite transmission to the television stations were fully protected under the "ephemeral recording" exemption contained in 17 U.S.C. § 112 (1993).[11] Under § 112, a "transmitting organization"—such as a television station—that has the right to transmit any work may make a single copy or phonorecord of a particular program embodying the work if: (1) the copy is retained and used solely for its own broadcasts within its local service area; (2) no additional copies or phonorecords are made; and (3) the copy or phonorecord is destroyed within six months after the first public transmission, unless preserved exclusively for archival pur-

---

9. When questioned by this court at the hearing, even plaintiff conceded that despite the extensive caselaw defining a derivative work, no court has found that merely recording a sound recording to an audiovisual program creates a derivative work under the Copyright Act. Tr. 20–22.

10. As stated previously, sound recording copyright owners do not possess "performance rights" under the Copyright Act.

11. While not specifically defined in the Copyright Act, Congress defined an "ephemeral recording" in the legislative history as a "cop[y] or phono-

record[ ] of a work made for purposes of later transmission by a broadcasting organization legally entitled to transmit the work." H.R. No. 94–1476, 94th Cong., 1st Sess. 102, *reprinted in,* 1976 U.S.C.C.A.N. 5659, 5716. The House Report further provided that in order to be eligible for the ephemeral recording exemption, the transmitting organization must be a transferee or licensee of performance rights in the copyrighted work, "except in the case of sound recordings [ ] *which have no exclusive performing rights under the [Act]." Id.* (emphasis added).

poses. 17 U.S.C. § 112(a)(1), (2) and (3) (1993).

Each day, Paramount produces and transmits an installment of "Hard Copy" which the television stations record for broadcast later that day. The local stations are allowed to make only one recording of the program and they are not permitted to "re-broadcast, re-run, distribute or disseminate" the program at any other time. *Kurshner Aff.*, ¶ 3–7. After the television broadcast, the stations are required by their license agreement to destroy their copy of Paramount's satellite transmission. *Id.* Not unlike the transmission of a regular news program to local television stations, the television defendants have no control over the production or programming of the Hard Copy program; they merely re-transmit the signals received from Paramount at a pre-determined broadcast time. *Id.* Accordingly, Paramount's satellite transmission of "Hard Copy" to the television stations and their subsequent transmissions to the viewing public are protected under the ephemeral recording exemption and have not infringed Agee's sound recording copyrights. Defendants are, therefore, entitled to summary judgment on plaintiff's copyright claim.[12]

### Plaintiff's Lanham Act Claim and Unfair Competition Claim are dismissed for failure to state a cause of action

Defendant also moves to dismiss plaintiff's Lanham Act claim and unfair competition claim for failing to state a cause of action upon which relief may be granted. After considering the allegations raised in the complaint, the court agrees that both claims should be dismissed.

**12.** Since the court has granted defendants' motion, it is unnecessary to address defendants' jurisdictional argument concerning the nonresident TV defendants.

**13.** More specifically, § 43(a) of the Lanham Act provides:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

Plaintiff claims that defendants' have violated the Lanham Act in that the same acts which allegedly support his copyright infringement claim "constitute false designations of the origins of [his sound recordings], unauthorized misappropriations [sic] of the commercial value [of the sound recordings], disparagement of the said works and confusion and deception to the public." Comp. ¶ 22. Conversely, defendants argue that plaintiff has failed to state a cause of action and has instead "merely recasted a meritless copyright claim" as a Lanham act violation. Def.'s Memo. Supp. Mot. Dismissal and Summ. J. at 36. As a result, defendants have moved that plaintiff's claims be dismissed and the court grant summary judgment as a matter of law. Defendants' motion is granted.

The purpose of the Lanham Act is to prevent consumer confusion regarding a product's source. *Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1220 (2d Cir.1987); *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986). Section 43(a)[13] provides two distinct causes of action: false designation of origin or source, known as "product infringement" claims, and false description or representation, known as "false advertising" claims. *Resource Developers, Inc. v. Statute of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2d Cir.1991). To support a claim for money damages under the Act, plaintiff must prove that defendants "deliberately engaged in a deceptive commercial practice," designed to deceive the public as to the source of the product. *Id.* at 140.

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a) (1994).

Plaintiff has alleged no facts in either the complaint or the supporting affidavits which suggest that defendants intentionally used his sound recordings to deceive the public. The complaint does not allege that defendants represented to the public that it possessed a copyright in plaintiff's sound recordings nor does it allege that defendants represented that the music used in the "Caught on Tape" segment was an original work. From the court's reading of the complaint, plaintiff's Lanham Act claim arises from the same basic facts which support his failed copyright claim—defendants' alleged unauthorized use of his sound recording in their television program without paying him a royalty or recognizing him in the credits to the program. As the District Court found in *Morita v. Omni Publications International, Ltd.*, 741 F.Supp. 1107, 1114 (S.D.N.Y.1990): "[t]he Copyright Act provides an adequate remedy" for claims involving the unauthorized use of copyrights. Accordingly, "[t]he Lanham Act should not be distorted to provide a remedy for a failed claim of copyright infringement." *Id.* Plaintiff's Lanham Act claim is, therefore, dismissed.

For the same reasons, the court finds it necessary to dismiss plaintiff's unfair competition claim. Although the complaint alleges that defendants' acts have caused a "diminution of good will [sic]" by connecting his sound recordings to "criminal activities," plaintiff has failed to plead facts or introduce evidence that his record sales or licensing revenues have in any way been affected by Paramount's performance of the Laurel & Hardy sound recordings. Comp. ¶ 35. Moreover, the court finds it hard to believe that plaintiff's professional reputation has been tarnished by defendants' use of the sound recordings. As plaintiff recognizes (Pl.'s Ex. A), the songs are universally recognized in connection with the comedic antics of Laurel & Hardy and the primary reason defendants' used the recordings was to similarly emphasize the comedic nature of the burglars' actions. Thus, plaintiff's claims are dismissed.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment on plaintiff's copyright claim is granted. Further, defendants' motion to dismiss plaintiff's Lanham Act claim and state law claim is granted because plaintiff has failed to state a claim on either ground which entitles him to relief. Plaintiff's motion to disqualify defense counsel is denied.