Michael L. AGEE, d/b/a L & H Records, Plaintiff-Appellant,

v.

PARAMOUNT COMMUNICATIONS, INC., et al., Defendants–Appellees.

No. 893, Docket 94–7670.

United States Court of Appeals, Second Circuit.

Argued Feb. 24, 1995.

Decided June 26, 1995.

Russell J. Frackman, Los Angeles, CA (Robert C. Welsh, Jeffrey D. Goldman, Mitchell, Silberberg & Knupp, Los Angeles, CA; John Walshe, John Walshe & Associates, New York City, on the brief), for plaintiff-appellant.

Leslie Gordon Fagen, New York City (Stuart M. Cobert, Robert A. Atkins, George E. Anhang, Paul, Weiss, Rifkind, Wharton & Garrison, on the brief), for defendants-appellees.

Frank W. Hunger, Asst. Atty. Gen., Vito J. DiPietro, Director, John Fargo, Asst. Director, Commercial Litigation Branch, U.S. Dept. of · Justice, Washington, DC; Eric Schwartz, Acting Gen. Counsel, Marilyn Kretsinger, Asst. Gen. Counsel, Charlotte Douglass, Harriett Oler, U.S. Copyright Office, Library of Congress, Washington, DC, submitted a brief, for amicus curiae The Register of Copyrights.

David E. Leibowitz, Washington, DC, submitted a brief, for amicus curiae the Recording Industry Ass'n of America, Inc.

Before NEWMAN, Chief Judge, VAN GRAAFEILAND and COFFIN,* Circuit Judges.

JON O. NEWMAN, Chief Judge:

■ The primary issue presented by this appeal is whether incorporating a copyrighted sound recording into the soundtrack of a taped commercial television production infringes the copyright owner's exclusive right of reproduction under the Copyright Act of 1976, 17 U.S.C. §§ 106 and 114(b) (1993). We hold that it does.

Plaintiff-appellant Michael L. Agee appeals from the June 3, 1994, judgment of the District Court for the Southern District of New York (Constance Baker Motley, Judge) granting summary judgment against him on his copyright claim against defendants-appellees Paramount Communications, Inc., Paramount Pictures, and Paramount Television Group ("Paramount") and the owners of 129 television stations ("TV stations"), and dismissing his Lanham Act and unfair competition claims for failure to state a cause of action. *See Agee v. Paramount Communications, Inc.*, 853 F.Supp. 778 (S.D.N.Y.1994). Paramount copied portions of Agee's sound recording to make the audio track of a segment of a television program, and transmitted the program to the TV stations, which in turn made their own copies for transmission to the viewing public.

We conclude that Paramount violated Agee's exclusive right of reproduction when it copied his sound recording on tape as part of the television program's soundtrack. However, we find that the copies of the program, including the duplicated portions of Agee's work, made by the TV stations are protected by the statute's "ephemeral recording" exemption, *see* 17 U.S.C. § 112. We agree with the dismissal of Agee's Lanham Act and unfair competition claims. We therefore affirm in part, reverse in part, and remand.

* The Honorable Frank M. Coffin of the United States Court of Appeals for the First Circuit, sitting by designation.

## Background

Plaintiff-appellant Michael L. Agee, a California resident, is proprietor of L & H Records, a music recording studio located in California. Through L & H Records, Agee owns copyrights in two sound recordings; "Laurel and Hardy's Music Box" ("Music Box") and "Laurel and Hardy's Music Box: Volume II" ("Music Box–Two"). Agee does not own the copyright in the musical compositions embodied in these sound recordings.

Defendant-appellee Paramount Communications, Inc. is a Delaware corporation whose principal place of business is California. Defendants-appellees Paramount Pictures and Paramount Television Group are divisions of Paramount. Paramount Pictures produces the daily, half-hour news magazine television program *Hard Copy* and transmits it to independently owned and operated television stations for broadcast nationwide.

Paramount copied portions of three songs from Agee's "Music Box–Two," entitled "Ku-Ku," "Cops," and "The Donkey's Ears," to make the audio track of a four-minute segment of its *Hard Copy* feature called "Caught on Tape." After duplicating parts of the recording, Paramount created an audiovisual work that timed or "synchronized" portions of the duplicated recording to visual images showing two young men engaged in an unsuccessful burglary attempt.

Paramount recorded the "Caught on Tape" feature on February 15, 1993, and integrated it into the *Hard Copy* program for satellite transmission to the TV stations for airing the next day. Portions of the feature, including Agee's recording, were also included in the opening and closing credits of the program. In addition, Paramount produced and transmitted to the TV stations a promotional commercial excerpted from the program, again including Agee's copyrighted work. The TV stations made their own copies of the program and the commercial and broadcast them to the public. Paramount neither sought nor obtained a license from Agee for the use of his recording, nor did it refer to him in the program's credits.

On September 10, 1993, Agee brought a copyright infringement action against Paramount and the TV stations for the unauthorized copying and synchronization of the songs from his sound recording, creation of a derivative work, and distribution or publication of that work to the public. Agee also alleged that defendants had engaged in unfair competition and that Paramount's use of his recording violated section 43(a) of the Lanham Act.

Agee moved by order to show cause for a temporary restraining order on November 19, 1993, seeking a preliminary injunction prohibiting the TV stations from rebroadcasting and Paramount from retransmitting the tape. The temporary restraining order was granted and then dissolved on the same day upon defense counsel's oral representation that the program would not be broadcast again. Thereafter, and prior to any discovery, Paramount and the TV stations moved for dismissal of the complaint and, alternatively, for summary judgment.

The District Court granted defendants' motion, dismissing Agee's state law and Lanham Act claims, and granting summary judgment on the copyright infringement claim after concluding that defendants had not infringed any of Agee's exclusive rights under the Copyright Act, which include the right to (1) reproduce the sound recording, (2) prepare a derivative work based upon the sound recording, and (3) distribute copies of the sound recording to the public. *See* 17 U.S.C. §§ 106, 114(b) (1993).

With respect to the exclusive right to reproduce a copyrighted sound recording, the District Court held that although the synchronization or "synch" right (*i.e.*, the right to use recorded music in synchronization with visual images on the soundtrack of a television program or motion picture) had been held to be a subset of a music publisher's right to reproduce his work, *see, e.g., Angel Music, Inc. v. ABC Sports, Inc.*, 631 F.Supp. 429, 433 n. 4 (S.D.N.Y.1986), such a synch right was not part of the sound recording copyright owner's exclusive reproduction

right, which was more limited. *See* 853 F.Supp. at 786–87. Rather, the Copyright Act proscribed only the "unauthorized sale or public distribution" of phonorecords or audiovisual works containing Agee's sound recordings, "which did not happen in this case." *Id.* at 787.

In addition, the District Court concluded that Paramount had not violated Agee's exclusive right to prepare derivative works from his recording because there was "no evidence that the sounds in [Agee's] recording were remixed, or that additional lyrics or musical variations were added, or that defendant took his recording and transformed it into a new original work." *Id.* at 788–89.

The District Court also held that Paramount's "transmission" of *Hard Copy*, together with Agee's sound recording, to the TV stations and the TV stations' transmission of the program to the public did not amount to "distributions" of copies of Agee's recording to the public, but were simply public "performances" of that recording. Because sound recording copyright owners do not have exclusive performance rights, *see* 17 U.S.C. § 114(a), these transmissions did not infringe Agee's rights. 853 F.Supp. at 789.

Additionally, the District Court noted that the TV stations' copies of the program were protected under the "ephemeral recording" exemption, 17 U.S.C. § 112, which permits "transmitting organization[s]" with the right to transmit any work to make a single copy of a particular program embodying the work if certain prerequisites are satisfied. 853 F.Supp. at 789–90.[1]

Finally, the District Court found that Agee had failed to state a cause of action under either the Lanham Act or unfair competition law. Agee's complaint did not allege that Paramount had misrepresented the source of the music used in the "Caught On Tape" segment or that it possessed a copyright in Agee's sound recordings. Rather, Agee's Lanham Act claim arose "from the same basic facts which support his failed copyright claim—defendants' alleged unauthorized use

---

**1.** The District Court also indicated that Paramount's actions were similarly protected under the ephemeral recording exemption, *see id,* though, as discussed below, Paramount now acknowledges on appeal that that exemption is inapplicable to it.

of his sound recording in their television program without paying him a royalty or recognizing him in the credits to the program." *Id.* at 791. As to the unfair competition claim, the District Court found that Agee had failed to plead facts or introduce evidence that his record sales or licensing revenues had been affected by defendants' use of his sound recording. *Id.*

This appeal followed.

### Discussion

Paramount's duplication and transmission of Agee's sound recording as part of the soundtrack of *Hard Copy,* and the TV stations' subsequent duplication and transmission of that program to the viewing public, are far removed from the record piracy that prompted Congress to enact legislation protecting sound recording copyright owners. That legislation is in some respects quite limited, denying owners of copyrights in sound recordings certain exclusive rights that are available to music publishers or to owners of copyrights in the underlying musical compositions.

Nevertheless, applying *de novo* review, *see Longo v. Shore & Reich, Ltd.,* 25 F.3d 94, 96 (2d Cir.1994), we conclude that Paramount's use of Agee's sound recording infringed his exclusive right to reproduce his work, notwithstanding the fact that the *Hard Copy* program containing his recording was broadcast only once and was not distributed to the public for sale or rental. However, we find no violation of Agee's exclusive right to distribute copies of his sound recording to the public. Moreover, although Paramount might have infringed Agee's exclusive right to prepare derivative works, we need not resolve that question because such an infringement would not expand Paramount's liability or alter our conclusion that the TV stations' duplication and broadcast of Agee's work was protected by the ephemeral recording exemption.

### A. Copyright Claim

*Statutory Background.* Section 106 of the Copyright Act of 1976 gives owners of copyrights in most works the exclusive right to reproduce the copyrighted work in copies or phonorecords, to prepare derivative works based upon the copyrighted work, to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending, to perform the work publicly, and to display the work publicly. 17 U.S.C. § 106. However, with respect to copyrights in sound recordings, which the Act defines as "works that result from the fixation of a series of musical, spoken, or other sounds," *id.* § 101, the Act confers more limited rights. Only the rights of reproduction, preparation of derivative works, and distribution of copies are conferred, and a performance right is explicitly not conferred. *Id.* § 114(a). Moreover, the rights that are conferred are more limited than in the case of other works.

The reproduction right is limited to the right "*to duplicate the sound recording in the form of* phonorecords, or of *copies of* motion pictures and *other audiovisual works, that directly or indirectly recapture the actual sounds fixed in the recording.*" *Id.* § 114(b) (emphasis added). The derivative work right is limited to the right "to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." *Id.*

Also pertinent to our inquiry in this case is the exemption that section 114 extends to broadcasters for "ephemeral recordings." Specifically, it is not an infringement for a "transmitting organization entitled to transmit to the public a performance or display of a work, under a license or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section 114(a), to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display." *Id.* § 112(a).

To be eligible for this exemption, a "transmitting organization" must satisfy three conditions: (1) the copy must be used solely by the transmitting organization that made it, and no further copies can be reproduced from it; (2) the copy must be used "solely for the transmitting organization's own transmissions within its local service

area, or for purposes of archival preservation or security"; and (3) unless preserved exclusively for archival purposes, the copy must be destroyed within six months from the date the program was first transmitted to the public.

■ 1. *Reproduction Right.* Congress's primary intention in granting sound recording copyright owners the exclusive right of reproduction was to prevent the unauthorized duplication of sound recordings that was causing substantial losses in the recording industry. *See United States v. Taxe,* 380 F.Supp. 1010, 1014 (C.D.Cal.1974) ("The legislative history of the [Sound Recording Amendment of 1971] indicates that its intent was to put record 'pirates' out of business."), *aff'd,* 540 F.2d 961 (9th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Indeed, the impetus behind the Sound Recording Amendment, which was largely incorporated into the Copyright Act, was the perceived need to prevent "widespread unauthorized reproduction of phonograph records and tapes." H.R.Rep. No. 487, 92nd Cong., 1st Sess. at 1 (1971) ("House Report").

Nevertheless, as *amicus* Register of Copyrights observes, the statutory language pertaining to the sound recording reproduction right is broad enough to include a synch right, which would require a producer to obtain authorization from the owner of a sound recording before reproducing that recording in the soundtrack of an audiovisual work. *See* 17 U.S.C. § 114(b).

■ In addition, the legislative history indicates that Congress intended to proscribe the unauthorized duplication of sound recordings in the soundtrack of audiovisual works. *See* House Report at 106 (infringement of copyright owner's reproduction right takes place "whenever all or any substantial portion of the actual sounds that go to make up a copyrighted sound recording are reproduced in phonorecords ... by reproducing them in the soundtrack or audio portion of a motion picture or other audiovisual work").

It thus appears that although the sound recording legislation was enacted primarily to combat piracy, that legislation, in its terms and its intent, is broad enough to cover some forms of reproduction even in situations where copies are not distributed to the public. The District Court considered a synch right to be an extension of the reproduction right defined by section 114(b). 853 F.Supp. at 787. We disagree. A synchronization of previously recorded sounds onto the soundtrack of an audiovisual work is simply an example of the reproduction right explicitly granted by section 114(b) to the owner of rights in a sound recording.

■ Moreover, the Copyright Act specifically permits certain entities to reproduce sound recordings in soundtracks, provided that copies of the programs containing those recordings are not distributed to the public. For example, Congress provided in section 114(b) that noncommercial broadcasting entities have the right to include sound recordings in educational radio and television broadcasts, and may distribute and transmit copies or phonorecords as long as "copies or phonorecords of said programs are not commercially distributed by or through public broadcasting entities to the general public." 17 U.S.C. § 114(b). The plain implication of section 114(b) is that commercial entities like Paramount may not reproduce sound recordings on soundtracks of audiovisual works, whether or not the reproduction involves synchronization.

Paramount acknowledges that its use of Agee's sound recordings in conjunction with visual images was technically a "reproduction," but argues that the pre-recording of the *Hard Copy* soundtrack with Agee's recorded sounds was purely "incidental" to a single, tape-delayed television performance— the technological equivalent of a live broadcast. Paramount observes that it could have played Agee's recording, in synchronization with the video tape, as part of a live performance of *Hard Copy* without infringing Agee's reproduction right.[2] Just as record-

2. This would have been a synchronization of the sound recording with visual images without a reproduction of that recording. One could imag-

ine a producer purchasing a sound recording, attaching the audio tape alongside a videotape containing visual images he has already assem-

ing a television program for later viewing permits a home viewer to shift the effective time of the performance, *see Sony Corp. v. Universal City Studios,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984), duplicating Agee's recording onto the soundtrack of an audiovisual work merely permitted Paramount to shift the time of the recording's broadcast to viewers.[3] Paramount asserts that no copies of the program containing Agee's recording were made for distribution or sale.

In *Sony,* the Supreme Court held that consumers were not infringing copyrights in broadcast programs when taping television shows for later viewing. *Id.* at 447–55. In concluding that this recording was a fair use of the copyright, the Court noted that the work was transmitted free of charge over the broadcast airwaves, and the copy was a "time-shifting" one. *Id.* at 449. No evidence indicated that a consumer had published or otherwise attempted to profit from a time-shifting copy. *Id.* The nature of a televised copyrighted audiovisual work and the fact that time-shifting merely enabled viewers to view at a later time works that they had previously been invited to watch rebutted the presumption that reproducing a copyrighted work in its entirety was unfair. *Id.* at 449–50. In addition, the Court held that time-shifting reproductions had no demonstrable effect upon the potential market for, or the value of, a copyrighted work, and that time-shifting yielded societal benefits by expanding public access to broadcast television programs. *Id.* at 454.

We need not decide in this case whether all copying of sound recordings, including commercial copying solely for time-shifting purposes, infringes the copyright owner's exclusive right of reproduction, because Paramount's duplication and synchronization of Agee's sound recording were designed to achieve more than a time-shifted performance of that recording. Paramount derived independent commercial value from copying Agee's sound recording because that reproduction not only shifted the timing of performance but actually enhanced the performance by ensuring that there would be no mistakes in the synchronized program broadcast to viewers. Reproducing Agee's recording in the soundtrack of *Hard Copy* also enabled Paramount to preserve the program intact for possible distribution or re-broadcast at a later date.

Indeed, Paramount's characterization of its reproduction as merely a time-shifted performance is belied by the additional copies and uses Paramount made of the taped synchronization. In addition to copying Agee's sound recording as part of its synchronization of the recording with the "Caught On Tape" segment, Paramount incorporated a portion of the "Caught On Tape" segment, including Agee's copyrighted work, into a promotion of the next day's program and also prepared a commercial that contained a portion of the segment along with Agee's recording. Although Paramount has not distributed copies of *Hard Copy* to the public or impaired the market for Agee's sound recording in any obvious sense,[4] its uses of its taped program suggest the value to Paramount, apart from time-shifting, of reproducing Agee's work.

bled, and showing this "work" in theaters or on television. By this means, not a single copy or *reproduction of the musical work would be made* despite a synchronization taking place. In practice, of course, most synchronizations typically involve duplication of the sound recording onto the soundtrack of the audiovisual work.

3. At approximately noon California time each weekday, Paramount transmits that day's *Hard Copy* program to the TV stations by satellite. The TV stations record the program from the satellite signal for broadcast later that day in their respective time zones. In a similar manner, the network evening news programs are transmitted by satellite to local television sta-

tions, many of which tape their programs for broadcast later that day.

4. Unlike the individual who duplicates a sound recording to avoid the cost of purchasing another copy or to sell unauthorized copies, Paramount's duplication of Agee's recording for purposes of making the soundtrack of its program was not designed to avoid purchasing another copy or sell copies of the recording. In this sense, Paramount did not affect the market for Agee's sound recording or deprive Agee of revenue for the sale of his recording. Nevertheless, duplication enabled Paramount to accomplish more than simply delay the timing of the performance.

In short, Paramount purchased Agee's sound recording but made no attempt to obtain a license for its reproduction in the soundtrack of its program. It therefore infringed Agee's sound recording at the moment it put portions of his recording on tape to make a segment of *Hard Copy*. Its incorporation of the sound recording without permission violated Agee's reproduction right.[5]

2. *Derivative Works.* Agee contends that Paramount also infringed his exclusive right to prepare derivative works based upon his sound recording. Under the Copyright Act, a "derivative work" is defined as a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted. *See* 17 U.S.C. § 101.

In the case of sound recordings, the Copyright Act imposes additional requirements before such a "transformation" of a preexisting work is sufficient to create a derivative work. *See id.* § 114(b); House Report at 106. Under section 114(b), the use of a sound recording qualifies as a derivative work only if "the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." 17 U.S.C. § 114(b). Thus, before the *Hard Copy* episode could be considered a derivative work of Agee's sound recording, it must be found that Paramount altered Agee's recording in a manner that "rearranged, remixed or altered in sequence or quality" the actual sounds in the recording. To the extent Agee contends that the mere synchronization of his sound recording with visual images created an infringing derivative work, we disagree. Although a few cases may exist where a motion picture or television program is "based upon" a preexisting musical composition or sound recording, sound recordings are most often used in audiovisual works for background or performance, as in this case. Moreover, even if the mere transfer of Agee's recording to the soundtrack of an audiovisual work in itself amounted to a "transformation," such synchronization would not rearrange, remix or alter the actual sounds of the recording.

However, Agee also alleges that Paramount edited his recordings, incorporating sound effects and narration with Agee's recordings in the soundtrack. Agee claims that "defendants altered the expression embodied in Agee's recording by abridging and condensing it, reordering it, [and] adding various sound effects." At oral argument, appellant contended that Paramount reordered and interspersed the actual sounds of the songs on his recording. The District Court concluded that although the soundtrack of *Hard Copy* added sound effects to Agee's recording, these additions did not alter the recording itself, but were designed only to "highlight" the visual images on the program. *See* 853 F.Supp. at 788.

Although the interspersing and abridgement of a sound recording may not, strictly speaking, involve sampling or amount to the traditional creation of a derivative work, such use of a recording appears to fall within the language of section 114(b), perhaps constituting a rearrangement or alteration in sequence. We need not determine the extent to which the recording was altered, however, because the finding that Paramount created a derivative work is unnecessary to a finding of infringement in light of Paramount's reproduction of Agee's recording, *see Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1373 (2d Cir.1993), and, as discussed below, would not affect our analysis with respect to the TV stations.

3. *Distribution Right.* Agee contends that Paramount infringed his exclusive

---

5. As *amicus* Recording Industry Association of America, Inc. observes, producers of movies, television shows, and commercials often obtain master use licenses from sound recording copyright owners that allow them to synchronize sound recordings with visual images, as well as to copy and distribute the audiovisual work. *See Platinum Record Co. v. Lucasfilm, Ltd.*, 566 F.Supp. 226, 226–27 (D.N.J.1983) (referring to synchronization or master use license for use of sound recordings in movie, "American Graffiti"); Nimmer, § 24.04[C][2] (referring to need for motion picture companies to obtain master use license before incorporating copyrighted sound recordings in motion pictures).

right to distribute his sound recording when it transmitted *Hard Copy,* including his work, by satellite to the TV stations because such a transmission constituted a distribution of one or more copies of his recording "to the public" under 17 U.S.C. § 106(3).[6] His contention is meritless.

The Copyright Act provides no definition of "distribution." As Agee observes, however, at least one court has concluded that the distribution right is essentially synonymous with the exclusive right of "publication" referred to in the 1909 Copyright Act. *See Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 299 (3d Cir.1991). *See also* House Report at 102 ("Clause (3) of section 106 established the exclusive right of publication."). The 1976 Act defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. In addition, "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes "publication." *Id.*

We find no basis for concluding that Paramount's transmission of Agee's recording to viewers via the TV stations, rather than directly, was a "distribution." In a slightly different context, a number of courts have held that "[t]ransmissions by a cable network or service to local cable companies who in turn transmit to individual cable subscribers constitute 'public performances' by the network under [the Copyright Act]." *Coleman v. ESPN, Inc.,* 764 F.Supp. 290, 294 (S.D.N.Y.1991); *see also David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. 752, 759 n. 3 (S.D.N.Y.1988) (transmission to cable operator by cable programmer is public performance under Copyright Act); *WGN Continental Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622, 625 (7th Cir.1982).

Treating such satellite transmissions as public performances protects music publish-

ers and owners of copyrights in musical compositions, who have exclusive performance rights under the Copyright Act; otherwise, producers and networks could avoid liability by relying on local stations to perform a copyrighted work. *See David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. at 759 ("Congress apparently did not anticipate the eventual proliferation of organizations such as SMC who 'broadcast' their programs to the public indirectly, through local cable companies who pass the signal along to their individual customers."). By contrast, in transmitting *Hard Copy,* along with Agee's recording, to the TV stations for transmission to the public, Paramount was not attempting to evade liability for performing Agee's copyrighted work because Paramount itself had the right to perform that work.

■ It is clear that merely transmitting a sound recording to the public on the airwaves does not constitute a "distribution"; otherwise, sound recording copyright owners would have the performance rights expressly denied to them under the statute. For this reason, distribution is generally thought to require transmission of a "material object" in which the sound recording is fixed: a work that is of "more than transitory duration." *See* 17 U.S.C. § 101 (defining "copy"); David Nimmer & Melville B. Nimmer, 2 *Nimmer on Copyright,* § 8.11[A] (1993) (distribution right is right "publicly to sell, give away, rent or lend any material embodiment of copyrighted work"). *See also* House Report at 138 ("any form or dissemination in which a material object does not change hands—performances or displays on television, for example—is not a publication no matter how many people are exposed").

Although we are unwilling to say that disseminations must always be in physical form to constitute "distributions," *see, e.g., Playboy Enterprises, Inc. v. Frena,* 839 F.Supp. 1552 (M.D.Fla.1993) (unauthorized uploading of copyrighted images onto computer bulletin

---

**6.** Paramount argues that Agee has waived his distribution claim by failing to raise it below. In fact, however, Agee alleged in his complaint that Paramount and the TV stations had violated his rights by engaging in "[t]he continued sale, syndication, distribution, exploitation, dissemination

and publishing" of his sound recording, and the District Court expressly found that "defendants' use of plaintiff's sound recording has not infringed any of his exclusive rights under the Copyright Act." There is thus no basis for finding waiver of this issue on appeal.

board with knowledge that images would be downloaded by other bulletin board subscribers), in the broadcasting context, the distinction between material and non-material embodiments, and the fact that Paramount, like most television and radio broadcasting networks, transmitted its program for broadcast to the public, are relevant factors in determining whether Paramount engaged in broadcasting rather than distribution. We conclude that Paramount's transmission of Agee's recording constituted a performance of that recording and not a distribution.

■ 4. *Ephemeral Recording Exemption.* The District Court found the ephemeral recording exemption, *see* 17 U.S.C. § 112(a), applicable to both Paramount and the TV stations. This exemption permits "transmitting organizations," defined as broadcasting networks or local broadcasters, *see* House Report at 102, to make a single copy of a copyrighted work to facilitate their broadcast, provided certain prerequisites are met. Paramount now concedes that it is ineligible for this exemption because it is a program supplier rather than a broadcaster, and thus is not a "transmitting organization" under the statute. However, appellees contend that the exemption applies to the TV stations and thus protects the TV stations' copying and broadcast of Agee's recording.

There is no dispute that the TV stations are "transmitting organizations" for purposes of section 112(a). The TV stations also appear to have complied with the preconditions for invoking the ephemeral recording exemption, *see* 17 U.S.C. § 112(a), because they made a single copy of the program containing Agee's sound recording, used this copy solely for their own transmission in their service area, and, pursuant to their contract with Paramount, had to destroy their tape or return it to Paramount.

Agee contends, however, that the TV stations are not entitled to the ephemeral recording exemption because they copied and broadcast an unauthorized reproduction or derivative work containing Agee's sound recording. This contention is arguably supported by the language of section 112(a), which allows transmitting organizations to make a copy of a copyrighted work only if they are "entitled to transmit to the public a

performance or display of a work, under a license or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section 114(a)." *Id.* § 112(a). According to Agee, because the *Hard Copy* program was "tainted" by Paramount's unauthorized use of his work, the TV stations could not copy or perform the program without first obtaining Agee's permission. *See* House Report at 102 ("unless all [limitations on the scope of the ephemeral recording privilege] are met the making of an 'ephemeral recording' becomes fully actionable as an infringement").

We reject this argument, despite its surface plausibility and despite the fact that Paramount reproduced, and perhaps also prepared a derivative work based upon, Agee's recording. Because Agee has no exclusive performance rights, *see* 17 U.S.C. § 114(a), the TV stations were entitled to broadcast his recording without his consent. Nothing in the statute would prohibit the TV stations from also broadcasting a *reproduction* of Agee's sound recording since, like Paramount's transmission of its program to the TV stations, such a broadcast would still constitute a "performance." Had the TV stations themselves purchased Agee's sound recording, copied it, and then broadcast the recording to the public using the copy, they would have been at most liable for the duplication and not for the broadcast. The fact that Paramount, rather than the TV stations, reproduced Agee's recording does not alter the result.

The TV stations also would have been entitled to perform a *derivative work* that Paramount had created using Agee's sound recording. The statute states only that sound recording copyright owners have the exclusive right to "prepare" derivative works, *see* 17 U.S.C. § 114(b); it says nothing about the right to *perform* such works. Although some performances might create a derivative work (e.g., an improvised performance that recasts or remixes a sound recording), in this case, it was Paramount who prepared the work, with the TV stations merely broadcasting that work to the public.

Because the TV stations had the right to broadcast Agee's reproduced or altered sound recording "under the limitations on exclusive rights in sound recordings specified

by section 114(a)," the stations are protected by the ephemeral recording exemption.

### B. Lanham Act and Unfair Competition Claims.

■ Agee's Lanham Act and unfair competition claims require relatively little discussion. To state a claim for damages under the Lanham Act, Agee must allege a false representation of the source of his sound recording and actual confusion by consumers as to the source. *See PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 271 (2d Cir.1987). Agee alleges that by failing to attribute the recording to him in the credits of *Hard Copy*, and by playing his recording while the credits were being shown, Paramount misrepresented the source of the recording or at least suggested that it owned a copyright in the recording.

However, Agee has alleged no facts suggesting that appellees "deliberately engaged in a deceptive commercial practice" designed to deceive the public as to the source of the product. *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir.1991). There is no allegation that appellees intentionally used Agee's sound recording to deceive the public, nor is there any factual allegation that the public was in any way confused as to the source of the sound recording as a result of Paramount's failure to attribute that recording to Agee.

As the District Court found, Agee based his Lanham Act claim entirely on the fact that appellees made unauthorized use of his sound recording without paying him a royalty or recognizing him in the credits to the program. *See Merchant v. Lymon*, 828 F.Supp. 1048, 1060 (S.D.N.Y.1993) (extending Lanham Act to cover "circumstances where an artist has not been properly credited for his ownership would simply transform every copyright action into a Lanham Act action as well"). Consequently, dismissal of the Lanham Act claim for failure to state a cause of action was appropriate.

■ Similarly, Agee's state law unfair competition claim is baseless. Although Agee alleges that appellees' use of his sound recording has caused a "diminution of good will" by connecting his sound recording to "criminal activities" or associating it with *Hard Copy*, Agee has failed to plead facts indicating that his record sales or licensing revenues have in any way been affected by Paramount's use of the recording. There is no reasonable ground for believing that Agee has suffered economic losses as a result of appellees' actions, or that consumers think less of the recording.

### Conclusion

For the reasons set forth above, we affirm the dismissal of Agee's Lanham Act and state law claims as well as the grant of summary judgment in favor of the TV stations. With respect to Agee's claim of copyright infringement, we reverse the grant of summary judgment in favor of Paramount, and, because no genuine issues of material fact exist with respect to that claim, direct the entry of summary judgment for the plaintiff on the issue of Paramount's liability for copyright infringement, and we remand for determination of appropriate relief.