MURRAY HILL PUBLICATIONS, INC., a Michigan corporation, Rosary Take–One Productions L.P., a Michigan limited partnership, Plaintiffs,

v.

ABC COMMUNICATIONS, INC. (a/k/a ABC, Inc. and f/k/a Capital Cities/ABC, Inc.) d/b/a WJR Radio Defendant.

No. 98–CV–70884–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 1999.

Mayer Morganroth, Jeffrey B. Morganroth, Morganroth & Morganroth, Southfield, MI, for plaintiffs.

Hershel P. Fink, Cynthia G. Thomas, Honigman, Miller, Detroit, MI, for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

#### I. Introduction

#### A. Background

Detroit radio personality J.P. McCarthy, who died in August, 1995, spent years hosting the morning "drive-time" show on local radio station, WJR.[1] From about 1990 onwards, the show was introduced by a theme song written by Robert Laurel, a Detroit musician who owns both plaintiff Murray Hill Publications and plaintiff Rosary Take–One Productions. The song ("J.P.'s Theme") was derived by Mr. Laurel from an earlier song known as "Jeannette," also written by him. "Jeanette" had been used in a movie, produced by plaintiffs, entitled "The Rosary Murders." This intellectual property dispute involves certain uses of J.P.'s Theme, as well as the use of a line of dialogue from the movie and the physical appearance of the letters in a billboard advertising campaign launched by WJR on behalf of its J.P. McCarthy show.

During the movie, J.P. McCarthy delivered "the Line," which included the phrase, "J.P. on the JR in the a.m." Associated with the movie was a souvenir promotional brochure containing "the Artwork," which consisted of a child's scrawled printing of the Ten Commandments.

Before the court is defendant's motion for summary judgment, filed on February 26, 1999. Plaintiffs filed a response on March 30, 1999. With leave of court, plaintiffs filed a supplemental brief on June 25, 1999. Defendant filed a reply brief on July 8, 1999. A hearing was held on September 1, 1999.

#### B. Facts

The undisputed evidence produced in this case can be summarized as follows: J.P. McCarthy had a well-known radio program for years on WJR until his death in 1995. His signature line for nearly 30 years was "J.P. on the JR in the a.m." or some variation thereof. In 1986, Mr. Laurel gave his then-friend J.P. McCarthy a bit part in his movie, "The Rosemary Murders," in which McCarthy can be heard speaking "the Line" over a radio in the background of a scene. Mr. Laurel also published some souvenir brochures for the movie that contained a reproduction of a young child's printed rendering of the Ten Commandments. No evidence exists, though, that either plaintiff owned the child's method of writing, or that such a method can be owned by anyone.

In 1990, Mr. Laurel gave Mr. McCarthy a song called "J.P.'s Theme" while on the air during McCarthy's WJR program. No restrictions were put on that gift. From 1992 until 1995, WJR advertised McCarthy's program by printing his signature line "J.P. on the JR in the a.m." on billboards in graffiti-style writing.

In the hours after Mr. McCarthy's sudden death, McCarthy's producer made a compilation of McCarthy's programs from over the years and played it the next morning in a tribute program during the traditional time slot. Later, with the permission of WJR, the J.P. McCarthy Foundation to Fight Blood disorders—which plaintiffs chose not to name as a party in this lawsuit—used an edited version of the tribute, including the gifted composition, as a charitable fundraiser. WJR promoted the tribute's sales, but received no funds from it.

---

1. Although the station broadcasts from Detroit, the "clear-channel" nature of its wavelength allows it to be heard far beyond Michigan and Eastern Ontario most of the time.

## C. Plaintiffs' Complaint

Plaintiffs assert that defendant used its musical composition, J.P.'s Theme, without authorization. Plaintiffs further claim that the Line "J.P. on the JR in the a.m." was an original work written by Mr. Laurel for the film "The Rosary Murders" and that defendant unlawfully used it as a marketing slogan. Those two actions are alleged to be in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.* (Count I). Defendant's use of the musical composition and the Line also form the basis of plaintiffs' claims under the Lanham Act, 15 U.S.C. § 1125 (Count II). Plaintiffs also allege conversion based on defendant's use of the musical composition and the ideas and concepts of the "The Rosary Murders" (Count III). Plaintiffs claim that defendant's use of the ideas and concepts of "The Rosary Murders," including the use of the musical composition and the Artwork, unjustly enriched defendant to plaintiffs' detriment (Count IV). Plaintiffs claim they are owed quantum meruit for defendant's use of their ideas (Count V). Finally, plaintiffs allege that defendant's use of the musical composition, the Line, and the Artwork, was unfair competition under Michigan common law (Count VI).

## II. Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to his or her case with respect to which he or she bears the burden of proof. *Id.* at 323, 106 S.Ct. 2548. The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir. 1989), *i.e.,* that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1476. The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

## III. Discussion

### A. Count I—The Copyright Act

 In order to establish copyright infringement, the plaintiff must prove: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Ellis v. Diffie,* 177 F.3d 503, 507 (6th Cir.1999) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)); *see also Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093, 1095 (6th Cir.1995). At the threshold, the court must ensure that jurisdiction has been established. Regis-

tration with the copyright office is permissive, not mandatory, *see* 17 U.S.C. § 408(a); however, registration of the copyright is a jurisdictional prerequisite to an infringement suit. 17 U.S.C. § 411(a) *see Buemi v. Lewis,* 51 F.3d 271, 1995 WL 149107 at * 1 (6th Cir.1995) (unpublished opinion). Therefore, valid registration of a copyright is a prerequisite for the court's jurisdiction.

There is a three year statute of limitations for copyright actions beginning from the date "the claim accrued." 17 U.S.C. § 507(b). In this circuit, the statute bars any claims which accrued prior to three years before the complaint was filed. *Hoste v. Radio Corp. of America,* 654 F.2d 11 (6th Cir.1981).

## 1. Musical Composition

### a. The Court Has No Jurisdiction Over "J.P.'s Theme"

■ The underlying musical composition "Jeannette," from which "J.P.'s Theme" was derived, was copyrighted in 1986. Mr. Laurel altered "Jeanette" with the addition of horns, voices and lyrics to create "J.P.'s Theme." The parties do not dispute that "J.P.'s Theme" is a "derivative work." Section 103(a) of the Copyright Act provides that derivative works may be copyrighted. A derivative work is:

> a work based upon one or more pre-existing works, such as a . . . sound recording . . . or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101. Plaintiff has not registered the derived musical composition "J.P.'s Theme" with the copyright office, and it does not have its own copyright.[2] Accordingly, the court does not have jurisdiction to hear an infringement claim regarding the unregistered "J.P.'s Theme."

### b. The Non–Exclusive License Bars An Infringement Suit

■ Although the court does have *jurisdiction* to consider plaintiffs' claim to the extent that defendant's use of the derivative work "J.P.'s Theme" infringed upon the underlying work "Jeanette," plaintiffs have waived the right to assert that claim. The uncontroverted testimony is that Mr. Laurel "gifted" "J.P.'s Theme" to J.P. McCarthy while on the air at WJR during McCarthy's program. Both parties characterized that gift as a "non-exclusive license." The license at issue was granted orally, as well as implied by the conduct of the parties. *See Johnson v. Jones,* 149 F.3d 494, 500 (6th Cir.1998). "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James,* 144 F.3d 229, 236 (2nd Cir.1998) (citing *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753 (11th Cir.1997)); *Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1338–39 (9th Cir.1990). Mr. Laurel's grant of the non-exclusive license to Mr. McCarthy precludes him from bringing an infringement action against WJR for playing recordings of McCarthy using the song as intended. Plaintiffs allege only that WJR played the song in exactly the format that Mr. Laurel now claims to have intended at the time of the gifting—namely, in conjunction with

**2.** Plaintiffs' attorneys twice asserted in their brief, and again initially at the hearing, that "J.P.'s Theme" was registered with the U.S. Copyright Office. *See* Pl. Opp. at 1–2 and 15. That assertion is false. The documents upon which counsel based their assertion—Plaintiffs' Exhibit J and Laurel's deposition—demonstrate only that "J.P.'s Theme" is registered with ASCAP, which is not related to the U.S. Copyright Office, either functionally or struc-

turally. At the hearing, plaintiffs' counsel may have eventually conceded that no such copyright exists (the court remains uncertain about that). It appears that plaintiffs' counsel either attempted to mislead the court, or are ignorant of a fundamental aspect of copyright law. Whether duplicity or ignorance is at work, counsel's representations in this area are troubling.

J.P. McCarthy's program. There is no evidence of any restrictions on the license pertaining to whether the song could be played with pre-recorded programs or played only during live programs; or how many times or how far in the future it could be played; or that it could be played only while J.P. McCarthy was alive. Furthermore, common sense indicates that a radio station might keep recordings of its programs for future use.

### c. There Were No Enforceable License Restrictions

Plaintiffs could have brought a breach of contract action for violating license restrictions, but for the undisputed fact that no restrictions were imposed. *See, e.g. Graham,* 144 F.3d at 235.

> The rights between the underlying copyright owner and derivative owner should be determined by the contract between them. Absent any such contract, copyright protection may be forfeited in the derivative work, to the extent that the underlying work continues to enjoy copyright protection.

1 Melville Nimmer & David Nimmer, *Nimmer on Copyright,* § 304[A] (1999) ("Nimmer"). The gifted non-exclusive license was oral in form, and contained no explicit restrictions on its use, other than the understanding that Mr. Laurel would receive any ASCAP royalties for its use at WJR. He received those royalties. Mr. Laurel makes clear in his deposition testimony that any restrictions he may have intended at the time of the gifting—other than the restriction regarding royalties— were not discussed among the parties present. At his deposition, Mr. Laurel was unable to even define what those license restrictions were, other than to express his feeling that he had not meant for defendant to use them in the ways at issue in this litigation. Such *post hoc* regrets do not constitute enforceable licensing restrictions.

### d. The ASCAP Royalties Are Immaterial

Also untenable is plaintiffs' argument that ASCAP's royalty payments to Mr. Laurel constitute evidence that, pursuant to the non-exclusive license, WJR had agreed to pay him for each performance of "J.P.'s Theme." Plaintiffs' evidence on this issue consists of the following: (1) Mr. Laurel understood from his discussions with WJR personnel that he would receive some form of royalty payments from AS-CAP for the use of "J.P.'s Theme;" (2) Mr. Laurel has no understanding of how AS-CAP royalty payments are made; and (3) Mr. Laurel received royalty payments from ASCAP. Defendant has presented unrefuted evidence that it has a "per-program" license from ASCAP.

> Under a per-program license, ASCAP grants a music user the right to perform any of ASCAP's compositions as many times as the user wishes. In exchange, the user pays a license fee for only those programs in which it actually performs ASCAP music ... Historically, the per-program license fee rate has consisted of a fee for feature performances of AS-CAP music and a fee for incidental use of ASCAP music ... The incidental use fee ... provides ASCAP with payment for a station's broadcast of non-feature music including commercial jingles less than sixty seconds long, background music and ambient music picked up during the coverage of public events.

*United States v. ASCAP,* 981 F.Supp. 199, 201–02 (S.D.N.Y.1997). "Incidental use" under a per-program license also includes "themes or signatures." *See United States v. ASCAP,* 1993 Copr.L.Dec. ¶ 2027.088, 1993 WL 60687 at *52 (S.D.N.Y. March 1, 1993).

Under the ASCAP per-program system, WJR simply paid a blanket fee for its incidental uses, which included "J.P.'s Theme," without regard to how often incidental music was played. ASCAP then divided the pooled royalty fees according to its own formula among its members.

*See, generally Nimmer* § 8.19. No evidence was presented that WJR reported or had any obligation to report the frequency or nature of its use of "J.P.'s Theme."[3] Consequently, the ASCAP royalty payment system for "incidental use" under WJR's per-program license demonstrates nothing about the nature of the license Mr. Laurel granted. He would have received the same payments regardless of how often WJR played "J.P.'s Theme."

### e. Defendant Cannot Be Liable For The Foundation's Actions

Finally, whatever complaints plaintiffs may have about the J.P. McCarthy Foundation's use of "J.P.'s Theme" are misplaced in this lawsuit. That the Foundation might have used the musical composition is not an issue for this court because the Foundation is not a party to the action.[4]

### 2. The Line

■ The complaint in the instant case was filed on February 27, 1998. Therefore, any claims by plaintiff which accrued prior to February 27, 1995 are barred by the statute of limitations. Mr. Laurel testified that he became aware of the advertising campaign that purportedly utilized the Line and Artwork sometime in the late 80s or early 90s. Because the advertising campaign did not even begin until mid–1992, the most charitable assumption is that Mr. Laurel became aware of it around the time of its inception. Accordingly, plaintiff's infringement claims regarding the use of the Line and Artwork on billboards are clearly barred by the statute of limitations.

■ Even if the Line infringement claims were not time-barred, the Line is not amenable to copyright protection. The Line itself is not copyrighted. The only proof of registration concerning the Line "J.P. on the JR in the a.m." is the copyright of "The Rosary Murders" in 1988. A line in a movie is capable of being protected by copyright if the line is "readily recognizable to the lay observer as key lines of dialogue from the copyrighted movie." *See Universal City Studios v. Kamar*, 1982 WL 1278 (S.D.Tex.1982) (discussing the distinct and well-developed character of E.T.). There is no evidence before the court that the Line has such notoriety; it would seem obvious that the average Detroit listener would connect the Line to J.P.'s morning show on WJR rather than a somewhat obscure motion picture. Indeed, Mr. Laurel testified that the Line was an insignificant part of the movie and in no way pertinent to the plot. In any event, the unrebutted testimony of McCarthy's wife and son demonstrates that J.P. McCarthy used the Line for years on his morning show prior to the creation of "The Rosary Murders."[5] Even if the court did

---

3. In fact, the evidence shows that Mr. Laurel himself contacted ASCAP to notify it that WJR would be using "J.P.'s Theme" so that Laurel would begin receiving royalty payments. Mr. Laurel does not contend that it was Mr. McCarthy who owed him royalty payments for what Laurel claims was the licensing of "J.P.'s Theme" exclusively for McCarthy's use on the morning program. Nor does Mr. Laurel claim that Mr. McCarthy ever paid him such royalties. If anything, Mr. Laurel's behavior in discussing royalties with WJR and ASCAP indicates that Mr. Laurel believed at the time the license was given it belonged—at least in part—to WJR, the owner of Mr. McCarthy's program. Otherwise, had Mr. Laurel intended to make the license personal to Mr. McCarthy, he could have made separate royalty arrangements.

4. The court notes this only for purposes of observing that plaintiffs' complaints are largely misdirected, and not to opine that the legal claims would be more meritorious if they were directed at the Foundation.

5. In addition to being unrebutted, the testimony makes perfect sense. The Line appears to have been a kind of "inside" joke or special effect crafted to increase the movie's realism for Detroiters. If the author of a script desires an effect that is recognizable to a Detroit-area viewer of the movie, he would likely want the distinctive background voice of J.P. McCarthy to say something that is already heard around Detroit, something such as an oft-repeated "tag line" easily associated with the speaker. It is counter-intuitive that a

have jurisdiction over this claim, the evidence clearly establishes that plaintiffs are not the owners of the phrase "J.P. on the JR in the a.m." Because the Line is not independently registered, and because it is not readily recognizable from the movie, it is not copyrighted. Hence, the court does not have jurisdiction over plaintiffs' copyright claim for the Line.

## B. Count II—Lanham Act

Section 43(a) of the Lanham Act prohibits any person from using "any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods." 15 U.S.C. § 1125(a)(1)(A); *See also Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 998 F.Supp. 757, 760 (E.D.Mich.1998).

■ Plaintiffs claim that defendant's use of the musical composition, the Line, and the Artwork without credit or attribution was misleading and converted their work without authorization. A proper Lanham Act claim requires that plaintiff must allege a false representation of the source of his original work and actual confusion by consumers as to the source. *See Agee v. Paramount Comm., Inc.*, 59 F.3d 317, 327 (2nd Cir.1995). There can be no Lanham Act claim when plaintiff:

has alleged no facts suggesting that [defendant] "deliberately engaged in a deceptive commercial practice" designed to deceive the public as to the source of the product. [Where] [t]here is no allega-

tion that [defendant] intentionally used [plaintiff's work] to deceive the public, nor is there any factual allegation that the public was in any way confused as to the source of the [work] as a result of [defendant's] failure to attribute that [work] to [plaintiff] . . .

plaintiff has failed to state a Lanham Act claim. *Id.*, (plaintiff's unsuccessful Lanham Act claim based entirely on fact that defendant made unauthorized use of his sound recording without paying him royalties or recognizing him in program credits), citing *Merchant v. Lymon*, 828 F.Supp. 1048, 1060 (S.D.N.Y.1993) (extending Lanham Act to cover "circumstances where an artist has not been properly credited for his ownership would simply transform every copyright action into a Lanham Act action as well").

■ The gravamen of a Lanham Act claim is likelihood of confusion. Plaintiffs are not alleging that someone else got credit for the composition and Line, but rather that they were not credited. Defendant has not misrepresented the origin of the music or the Line. Instead, defendant merely failed to assign any credit to the use of either. Plaintiffs have not alleged a false representation,[6] and hence, a Lanham Act violation has not been stated.

## C. Count III—Conversion[7]

■ A three-year statute of limitations applies to conversion claims, and the limitations period begins to run at the time of

script's author would want to write something wholly new and unfamiliar to the intended sub-audience of Detroit viewers, who would be far less likely to "get it" if confronted with unknown phrases. These observations by the court are merely mentioned in passing. They are close to the realm of fact-finding which in a summary judgment context is improper, and the court accordingly does not consider them in its evaluation.

6. Moreover, plaintiffs have not made the required showing of actual confusion or likelihood of injury. Plaintiffs argue that defendant's employees were confused concerning the origin of the Line, and that defendant

used the music and the Line in connection with its broadcast in a manner to suggest that they themselves owned the material. Whether defendant's employees knew who created the Line is immaterial and does nothing to establish that the *public* was deceived in any way.

7. It is highly likely that plaintiffs' conversion (Count III) and quantum meruit (Count V) claims are both preempted by the Copyright Act. Given that summary judgment on both issues can be readily granted on the merits, the court will assume, without so holding, that neither claim is preempted.

the conversion, not of its discovery. *See Comerica Bank v. Suburban Trust & Savings Bank,* 99 F.3d 1138, 1996 WL 585888 at *4 (6th Cir.1996) (unpublished opinion) (relying on M.C.L. § 600.5805(8)); *Continental Casualty Co. v. Huron Valley National Bank,* 85 Mich.App. 319, 271 N.W.2d 218, 221 (1978); *see also Insurance Co. of North America v. Manufacturers Bank of Southfield,* 127 Mich.App. 278, 338 N.W.2d 214, 216 (1983). The advertising campaign of which plaintiffs complain (because it purportedly "converted" the Line and the Artwork) began in mid–1992. Accordingly, plaintiffs' conversion claims regarding the Line and Artwork are time-barred because this suit was not filed until February 27, 1998. Plaintiffs were barred from bringing this claim after mid–1995.[8]

Furthermore, under Michigan law, conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial or inconsistent with the rights therein." *Sarver v. Detroit Edison Co.,* 225 Mich.App. 580, 571 N.W.2d 759, 761 (1997) (citing *Foremost Ins. Co. v. Allstate Ins. Co.,* 439 Mich. 378, 391, 486 N.W.2d 600 (1992)). "The gist of conversion is the interference with the control of the property." *Id.* at 762 (internal citations and quotations omitted). In the first instance, plaintiffs have no property in this case to be interfered with. "J.P.'s Theme" was explicitly given by Mr. Laurel to J.P. McCarthy on his WJR program without any explicit restrictions on its use. And even if the advertising campaign claim were not time-barred, Mr. Laurel does not—and never has—owned the Line or the Artwork, neither of which are susceptible to ownership. Finally, defendant has done nothing that would prevent plaintiffs from exercising full use of any of the disputed items. Plaintiffs' conversion claim is wholly without support.

### D. Count IV—Unjust Enrichment

As a matter of law, plaintiffs' unjust enrichment claims are preempted by the Copyright Act because there are no elements of an unjust enrichment claim beyond those required to prove copyright infringement. *See, e.g. Rainey v. Wayne State University,* 26 F.Supp.2d 963, 969–70 (E.D.Mich.1998) (collecting extensive cases and commentary); *Wrench LLC v. Taco Bell Corp.,* 49 U.S.P.Q. 1032, 1998 WL 480871 at *5–6 (W.D.Mich. June 18, 1998) (same); *P.I.T.S. Films v. Laconis,* 588 F.Supp. 1383, 1385–86 (E.D.Mich.1984) (same).

### E. Count V—Quantum Meruit

"Where a person receives a benefit from another and it is inequitable that the person retain the benefit, the person has been unjustly enriched and is required to make restitution." *Comber Tool & Mold Engineering, Inc. v. General Motors Corp.,* 853 F.Supp. 238, 241 (E.D.Mich. 1993) (citing numerous Michigan cases). "The party who rendered the services is entitled to 'quantum meruit' recovery, whereby the benefitted party is required to pay the reasonable value of services rendered." *Id.* at 242. Plaintiffs' quantum meruit claims fail at the threshold. Plaintiffs did not provide anything but "J.P.'s Theme" to defendant. As previously set forth, J.P. McCarthy had been using the Line for many years prior to the movie, and there is no evidence that defendant ever used or knew about the Artwork, which was not "takeable" in any case. According to plaintiffs' own pleadings and evidence, Mr. Laurel received in return

---

**8.** Even if the "discovery rule" were in effect, plaintiffs' claim would still be time-barred. As previously noted, the most favorable interpretation to plaintiffs of the facts presented by Mr. Laurel is that he became aware of WJR's advertising campaign around the time of its inception. Hence, even assuming that plaintiffs' had a meritorious claim—which they do not—their suit should have been filed no later than mid–1995. Mr. Laurel's claim that he did not become aware until 1995 that the Line and Artwork had been used without permission is specious; as the owner of the businesses that supposedly owned the Line and Artwork, he must have known whether he had granted permission to use his supposed "property." The discovery rule does not protect wilful ignorance.

exactly what he claims to have requested; namely, the ASCAP royalties to which he was entitled for WJR's incidental use of the signature composition. Plaintiffs' quantum meruit claim fails.

## F. Count VI—Unfair Competition

 "Ordinarily, one simply cannot be found guilty of unfair competition when the facts indicate no competition." *Boron Oil Co. v. Callanan*, 50 Mich.App. 580, 213 N.W.2d 836, 838 (1973). Plaintiffs admit that they are not in competition with defendant. Instead, plaintiffs claim that defendant accrued economic benefits from the alleged wrongful uses. "Competition" is a concept entirely distinct from "economic benefit." Economic benefits can be accrued from a wide variety of activities, including, but not limited to, competition. Here, plaintiffs allege only that defendant obtained intangible economic benefits from the favorable publicity engendered by supporting the foundation's tribute to J.P. McCarthy. The "unfair competition" cause of action is ordinarily unrelated to promotional marketing where the plaintiff is not competing with the defendant to sell that which is being marketed.

"There is, however, a longstanding exception to this rule where an outstanding and widely known name, made valuable by the owner ... is pirated." *Id.* Plaintiffs appear to rest their cause of action on this exception to the usual rule. As such, their claim for unfair competition is preempted by 17 U.S.C. § 301 because their claim is one for misappropriation that is equivalent to their copyright infringement claim. *See, e.g. Meyer v. Giles*, 1992 WL 489770 at *2–3 (W.D.Mich. Nov.30, 1992) (unpublished opinion). Their claim also fails because they have presented no evidence whereby a jury might reasonably find that any of the items in dispute here were widely known as belonging to Mr. Laurel. The evidence presented indicated merely that the Line and "J.P.'s Theme" might have been associated in the public mind with J.P. McCarthy, which would only be appropriate because the Line had been used by McCarthy for many years before Mr. Laurel's movie, and the song had been given to him by Mr. Laurel. There is no evidence whatsoever demonstrating that the graffiti "style" used in the Artwork was widely known or associated by anyone with anything.[9] Because there is no competition between plaintiffs and defendant, and because plaintiffs possess no widely-known name, there exists no evidence to support an unfair competition claim.

## IV. Costs & Attorney Fees

 Section 505 of the Copyright Act provides:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party.... Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the cost.

17 U.S.C. § 505. The Supreme Court has provided a list of non-exclusive factors a court may consider in determining whether either party should receive attorney fees, including, "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n. 19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (citing with approval *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (3d Cir.1986) (holding that district court could impose attorney

9. Plaintiffs' Artwork claims are absurd. There is nothing unique about the Artwork, and no similarity or relationship between the Artwork and WJR's billboards was even remotely demonstrated. With the exception that both are done by hand, the billboard writing looks nothing like the child scrawl in the souvenir brochure. There is no evidence that the two writings are in any way related. Even if any of plaintiffs' legal claims had survived summary judgment, the court would have granted summary judgment on any claims pertaining to the Artwork, as they are utterly devoid of merit.

fees where plaintiffs' lawsuit "patently had no legal merit")); *see also Quinn v. City of Detroit,* 23 F.Supp.2d 741, 752 (E.D.Mich. 1998) (citing additional factors of party motivation, and degree of success obtained in the lawsuit); *Sailor Music v. IML Corp.,* 867 F.Supp. 565, 570 (E.D.Mich. 1994) (citing additional factors of whether novel or complex issues justified the litigation, and defendant's underlying behavior).

In this case, plaintiffs presented a ragtag collection of ill-researched gripes cast as legal claims. Against this assault, defendant mustered undeniable facts and organized the law. This is a lopsided lawsuit. Plaintiffs demonstrated nothing in fact or law that might support their allegations. As set out in this opinion, there exists no *evidence* that could objectively support any of plaintiffs' claims.

The facts of this case provide no basis whereby a reasonable person could believe that anything had been wrongfully taken or used by defendant. Plaintiffs' claims regarding the Line and the Artwork are baseless; Mr. Laurel has no factual basis upon which to believe he ever had rights to either, much less that WJR used the Artwork in its campaign. Mr. Laurel's claims to "J.P.'s Theme" might be colorable, but for the fact that he *gave* the song to J.P. McCarthy and WJR with no condition other than that he receive the appropriate ASCAP royalties, which he did in fact receive. A significant number of plaintiffs' factual claims were made on the basis of hearsay assertions, speculation by Mr. Laurel, or through mischaracterizations of the evidentiary record.

Nor does the law provide plaintiffs any comfort. No novel or complex legal issues were presented. Instead, this case is most notable for the voluminous burden it imposed on defendant and the court. Each of plaintiffs' causes of action are fraught with defects even more numerous than those dealt with here. In analyzing these claims, judicial economy dictated that the court limit itself to the most obvious defects in each.[10]

This lawsuit was not objectively reasonable, either factually or legally. It is fairly characterized as frivolous. Because this suit never should have been brought, pursuant to § 505 of the Copyright Act, the court finds the defendant should be awarded reasonable costs and attorney fees.

## V. Conclusion

Accordingly, IT IS ORDERED that "Defendant's Motion for Summary Judgment" is GRANTED.

IT IS FURTHER ORDERED that within 21 days of receiving this Order, defendant FILE an itemized accounting of the costs and attorney fees incurred by defendant as a result of this suit. The court will examine the accounting and issue appropriate further orders.

---

**10.** The imposition on all concerned is particularly regrettable in light of the fact that even had plaintiff somehow pled a cognizable claim regarding "J.P.'s Theme" (the only item in this suit in which Mr. Laurel arguably had any property interest) the damages would be insignificant in light of the fact that WJR received not a penny for its use.