*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0295P (6th Cir.)
File Name: 01a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MURRAY HILL PUBLICATIONS, INC., a Michigan Corporation; ROSARY TAKE-ONE PRODUCTIONS LIMITED PARTNERSHIP, a Michigan limited partnership,
     *Plaintiffs-Appellants,*

     *v.*

ABC COMMUNICATIONS, INC., (a/k/a ABC, Inc. and f/k/a Capital Cities/ABC, Inc.) d/b/a WJR Radio,
     *Defendant-Appellee.*

No. 99-2268

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-70884—Robert H. Cleland, District Judge.

Argued: December 1, 2000

Decided and Filed: August 30, 2001

Before: WELLFORD, SILER, and BATCHELDER, Circuit Judges.

1

---

**COUNSEL**

---

**ARGUED:** Mayer Morganroth, MORGANROTH & MORGANROTH, Southfield, Michigan, for Appellants. Herschel P. Fink, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellee. **ON BRIEF:** Mayer Morganroth, Jeffrey B. Morganroth, MORGANROTH & MORGANROTH, Southfield, Michigan, for Appellants. Herschel P. Fink, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellee.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge. Plaintiffs Murray Hill Publications, Inc. and Rosary Take-One Productions Ltd. ("plaintiffs") brought this action against ABC Communications d/b/a WJR Radio ("WJR") raising federal claims of copyright infringement and violation of the Lanham Act, and state law claims of conversion, unjust enrichment, quantum meruit, and unfair competition. The district court granted summary judgment to WJR on all of plaintiffs' claims and dismissed the action, and plaintiffs filed this timely appeal. Because we conclude that plaintiffs' copyright and Lanham Act claims are without merit, that plaintiffs have failed to state a claim for unfair competition, and that plaintiffs' remaining state-law claims are preempted, we affirm the judgment of dismissal.

## I. BACKGROUND

The plaintiff corporations are owned by Detroit composer and producer Bobby Laurel. This story involves Laurel, his now-deceased friend, Detroit radio personality J.P. McCarthy, and Detroit radio station, WJR. For 30 years, McCarthy hosted a popular morning radio program on WJR. Because

they were friends, McCarthy often promoted Laurel's various music and film projects on his morning radio show.

In the early 1980's, Laurel began producing a movie called the ROSARY MURDERS ("the Movie"). The Movie was based upon a novel, written by a Detroit novelist and set in Detroit. The Movie itself was filmed in Detroit. In one scene of the movie, as actor Donald Sutherland enters a diner early in the morning, a radio can be heard playing in the background, and J.P. McCarthy's voice is heard saying, "Good morning, Detroit. This is J.P. on JR in the A.M. Have a swell day." ("the Line"). The Line was said over a song that was an original composition of Laurel's named *Jeanette*. Laurel registered both *Jeanette* and the ROSARY MURDERS with the United States Copyright Office.

After the film was completed, Laurel re-recorded *Jeanette* with some simple lyrics (J.P., J.P., J.P., J.P., J.P. McCarthy) for McCarthy to use as a theme song for his morning radio show ("J.P.'s Theme" or "the Song"). It is undisputed that Laurel appeared on McCarthy's show the day the Song was unveiled. It is undisputed that Laurel received royalties under WJR's "per program" license with the American Society of Composers, Authors and Publishers ("ASCAP"), although under the terms of WJR's ASCAP license, WJR did not specifically instruct ASCAP to pay those royalties to Laurel. ASCAP distributed a portion of WJR's flat rate payment to Laurel after Laurel advised ASCAP that the Song (*Jeannette* revised and renamed as *J.P.'s Theme*) was being played daily on WJR. WJR claims that Laurel gave both McCarthy and WJR a non-exclusive license to use the Song or the theme song, and that no payment terms were discussed. Laurel, on the other hand, claims that the license was limited to McCarthy's own personal use on his morning show, that the royalties were a critical part of the deal, and that the license necessarily expired upon McCarthy's death.

McCarthy died unexpectedly in August, 1995. On the day of McCarthy's death, WJR producers, faced with the prospect

of the next day's morning show and no host, compiled a "tribute" show consisting of memorable bits and pieces from McCarthy's programs over the years. The broadcast that next morning opened with the familiar theme song that had opened and closed McCarthy's morning show for nearly five years.

The tribute show was broadcast the morning after McCarthy's death. Public interest in the broadcast was immediate and pervasive. In the weeks following his death, McCarthy's wife and son and WJR executives concluded that the tribute show had significant market potential and could be a powerful fund-raising tool for the newly formed J. P. McCarthy Foundation ("the Foundation"). The Foundation had been created to support and encourage medical research into various blood disorders, including the one that killed McCarthy.

WJR employees worked on their own time to edit the broadcast—eliminating news, weather and commercials—and to obtain the releases required to convert the broadcast into a 90-minute recording for distribution ("the Recording"), which was available for sale just in time for the Christmas season in 1995. WJR actively promoted sales of the Recording, and a mail-order firm was employed to distribute the Recording. The Recording had significant sales, totaling around 400,000 copies. All of the proceeds were turned over to the Foundation. It is undisputed that WJR did not earn any profits for its role in distributing the Recording; however, Laurel argues that WJR did receive something of value—public acclaim, notoriety, and goodwill—for its role in this charitable endeavor. It is also undisputed that no one sought Laurel's permission to include the Song in the Recording and that Laurel was not credited with authorship of the Song on the insert packaged with the cassette tapes and CD's, while other artists and producers were credited on the insert for their respective contributions.

Plaintiffs also complain about an advertising campaign mounted by WJR from mid-1992 until McCarthy's death in

the district court, the law on certain relevant aspects of this lawsuit was unsettled. Because we believe the plaintiffs presented one or more colorable, albeit meritless, claims to the district court, we reverse the award of attorneys fees.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment dismissing the plaintiffs' action, but we reverse the district court's award of attorneys fees to WJR.

McCarthy's theme on the morning show, for which plaintiffs received the expected royalties.

Similarly, there is no basis on which plaintiffs can claim a contract implied in fact involving the Line or the Art Work. There is no evidence whatsoever in the record from which a jury could find that plaintiffs and WJR had any kind of meeting of the minds with regard to use of or payment for the Line or the Art Work. To the contrary, the record is clear that WJR never viewed either the Line or the Art Work as having anything to do with the plaintiffs, there is no evidence that either was ever discussed by or was the subject of correspondence between the parties, and plaintiffs never brought to WJR's attention their claims of wrongful appropriation until long after WJR had begun using the Line and the Art Work on the billboards.[6]

## G.   *Attorney's Fees*

We review an award of attorney fees under 17 U.S.C. § 505 for abuse of discretion. *See Ronald Mayotte & Assoc. v. MGC Bldg. Co.*, 1998 WL 385905, at *2 (6th Cir. July 1, 1998). In this case, the district court awarded attorney fees because it believed the plaintiffs' claims were utterly devoid of merit. In his harsh criticism of the plaintiffs, the trial judge wrote, "this case is most notable for the voluminous burden it imposed on defendant and the court. Each of plaintiffs' causes of action are fraught with defects even more numerous than those dealt with here." It was on this basis alone that the district court ordered the payment of WJR's attorney fees.

Unquestionably, the district court has the ability to impose attorney fees in frivolous and objectively unreasonable lawsuits. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n. 19 (1994). Contrary to the district court's assessment, however, we believe that at the time this litigation was before

[6] Accordingly, we see no need to discuss laches or time limitations.

August, 1995, in which WJR commissioned an artist to create a series of billboards to promote McCarthy's morning show. The billboards were designed with a graffiti-style print on a plain background, sporting one of two slogans—"J.P. on JR in the A.M." and "J.P. Makes My Morning." According to plaintiffs, the Line, "J.P. on J.R. in the A.M." was an original line, specifically created by Laurel for the Movie. WJR disputes Laurel's claim that he authored the Line, claiming that McCarthy had used it long before it appeared in the Movie. Plaintiffs further allege that in creating brochures to promote the Movie, Laurel commissioned a group of second grade students to write out by hand the Ten Commandments. One student's version was selected and published in a souvenir program that was distributed at the Movie's premier ("the Artwork"). Plaintiffs claim that the lettering style used on WJR's billboards was copied from the Movie's souvenir program with the intention of capitalizing on McCarthy's role in the film. WJR disputes this allegation and claims that its artists created the billboards without any reference whatsoever to plaintiffs' claimed Artwork.

In early 1996, Laurel began pressing his claims against WJR. Several letters were exchanged in which Laurel (or his attorney) expressed Laurel's discontent over WJR's use of the Song in the Recording and the Line and Artwork on the billboards without first obtaining his permission or giving him credit or royalties. When the parties could not agree this lawsuit ensued.

## II.  THE CLAIMS

Plaintiffs filed a six-count complaint in federal district court, alleging claims under federal statutory law and Michigan common law. Counts I and II sounded in federal law. Count I charged defendants with violating the Copyright Act because the defendants allegedly marketed, broadcasted, and otherwise used the Song, the Line, and the Artwork. Count II accused the defendants of violating the Lanham Act because they displayed the Line and the Artwork on

billboards and because they used the Song in the Recording without giving Laurel credit.

Counts III through VI sounded in Michigan common law. Count III sought recovery for the tort of conversion and accused defendants of converting plaintiffs' ideas and concepts—the Song, the Line, and the Artwork—for their own use in the marketing campaign for McCarthy's Foundation that followed McCarthy's untimely death. Count IV did the same under the rubric of unjust enrichment. Count V sought recovery under the equitable theory of quantum meruit alleging that defendant WJR always knew that plaintiffs intended to be paid for any use of their ideas and concepts. And Count VI alleged unfair competition under Michigan common law and charged that the defendants appropriated plaintiffs' Song, Line, and Artwork to deceive the public about who originated these works.

## III.  ANALYSIS

### A.  *Standard of Review*

We review de novo a district court's grant of summary judgment. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 409 (6th Cir. 1999). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When reviewing a motion for summary judgment, we must view the evidence and any inferences that may be drawn from the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

### F.    *The Merits of the Claim Designated "Quantum Meruit"*

Even if we were to disregard Michigan's well-established law distinguishing between contracts implied in law and contracts implied in fact, such that we could construe Count V as pleading a claim for breach of a contract implied in fact, we would be constrained to conclude that the claim, although not preempted, could not survive defendants' motion for summary judgment. We have searched the entire record of this case for some evidence that would permit a jury to conclude with regard to any promise by WJR to pay plaintiffs for the Song, the Line or the Art Work, that "the minds of the parties [met], by reason of words or conduct," *Cascaden*, 225 N.W. at 512. We have found not even a scintilla of evidence to that effect. Plaintiffs do not dispute that they did in fact receive the royalties they expected for J.P. McCarthy's use of the Song on the morning program. Bobby Laurel testified in his deposition that he composed the Song for J.P.; that he intended that J.P. would use the Song as his theme song on the morning program; that he understood from a meeting with Mr. Long of WJR that the Song would be used that way and WJR would pay royalties to Laurel through ASCAP. Laurel was explicitly asked, "Was there ever an expressed discussion of the payment of royalties?" Laurel responded:

> Yes, because we did not charge – I remember that because we did not charge him for production. I didn't intend to do that. I didn't charge him a creative fee and what was in it for us would be that we would receive royalties through ASCAP. That was the only thing in it for us.

Nowhere in Laurel's deposition or in any other part of the record is there any evidence that plaintiffs discussed with anyone associated with WJR any other use of or payment for the Song. In the absence of any such evidence, there is simply no basis upon which a jury could conclude that the minds of the plaintiffs and WJR ever met with regard to payment to the plaintiffs for any use of the Song other than the use as J.P.

reproduction, performance, distribution or display, whereas an action based on a contract implied in fact requires the extra element of a promise to pay for the use of the work which is implied from the conduct of the parties.

*Taco Bell*, 256 F.3d 459.  Contracts implied in law, we concluded, meet the equivalency requirement of the preemption analysis, while contracts implied in fact may not. The contract claimed in *Taco Bell* included the extra element of a promise to pay, requiring proof of an enforceable promise, which in turn would require proof of the mutual assent of the parties, and a breach of that promise. *Id.*

Here, plaintiffs have pled two implied-in-law contract claims.  Plainly, Count IV, the claim for unjust enrichment, depends on nothing more than WJR's unauthorized use of plaintiffs' work. Because that claim meets the equivalency requirement of the preemption analysis, we hold that it is preempted.  And unless the language of expectation in Count V is sufficient to add an element—namely the element of a promise to pay—to the acts of reproduction, performance, distribution or display that constitute the unauthorized use of plaintiffs' work, the claim denominated quantum meruit likewise depends on nothing more than that unauthorized work and is preempted.

We think that plaintiffs' allegation that WJR knew of plaintiffs' intention to be paid for the use of plaintiffs' work is not an allegation that WJR promised to pay, and does not purport to raise a claim of an implied-in-fact contract.  A claim that one party was aware of the expectations of the other is a far cry from a claim that the first party agreed to a course of conduct that would fulfill those expectations. We therefore hold that plaintiffs' claim in Count V is exactly what plaintiffs denominated it—a claim for recovery in quantum meruit for a contract plaintiffs contend should be implied in law.  We hold that this claim, like the claim for unjust enrichment, is preempted.

B.    *Copyright Infringement of the Song*

The district court held that it lacked jurisdiction over Laurel's copyright infringement claim relating to the Song because plaintiffs had never registered the Song with the Copyright Office (the original work, *Jeanette*, was registered, but the derivative work, *J.P.'s Theme*, was not.)  The court further held that although it had jurisdiction over the claim that WJR's use of the Song infringed the underlying work, this claim was waived because Laurel gave the Song to McCarthy, thereby granting a license at least by implication. Finally, the court held that the Foundation, the organization that without question actually profited from the sales of the Recording containing the Song, was not a party to the lawsuit and WJR was not liable for the Foundation's conduct. Because we agree that plaintiffs cannot bring an action for infringement of their copyright on the Song because it was not registered with the United States Copyright Office, we need not address the remaining issues relating to this infringement claim discussed by the district court—whether WJR had a license to use to the Song and whether the Foundation should have been named as a party to the lawsuit.

With very limited exceptions not relevant here, registration is a prerequisite to filing a copyright infringement suit. *See* 17 U.S.C. §411(a) ("[N]o action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title.").  In this case, the Song is a "derivative work." *See* 17 U.S.C. §101 ("A 'derivative work' is a work based upon one or more preexisting works, . . . . A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'").  Plaintiffs registered a copyright on the original work, *Jeanette*, but did not separately register a copyright for the derivative work, *J.P.'s Theme*.  Whether a separate registration for a derivative work is required is question of first impression in this jurisdiction and the answer is unsettled

among the Circuits. Our review of the issue persuades us that a copyright owner must formally register a derivative work with the United States Copyright Office as a prerequisite to filing a suit for infringement of that derivative work.

We first look to the literal language of the copyright statutes. 17 U.S.C. §411(a) requires that the copyright be registered before it can be asserted as a basis for infringement in federal court. *See M.G.B. Homes, Inc. v. Ameron Homes Inc.*, 903 F.2d 1486, 1488 (11th Cir. 1990). Section 103 of the copyright statute in particular distinguishes the nature of a copyright in a derivative work from the copyright in any preexisting work:

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is *independent* of, and *does not* affect or *enlarge the scope*, duration, ownership, or subsistence of, any copyright protection in the preexisting material. (emphasis added)

17 U.S.C. §103(b). These two statutes, read together, indicate that the derivative work is distinct from the preexisting work, and, therefore, the derivative work must be registered before an infringement suit may be brought.[1]

---

[1] Plaintiffs argue that because under §103(a) derivative works *may* be copyrighted, registration of a derivative work is not mandatory. This argument confuses copyright with registration. An author may have a copyright in all works of authorship regardless of whether he registers that copyright. The registration requirement under section 411(b) is a jurisdictional prerequisite to the right of the holder to enforce the copyright in federal court.

Plaintiffs cite *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989) for the proposition that derivative works enjoy copyright status. This is undoubtedly true. Plaintiffs clearly enjoy a copyright in both

> There are two kinds of implied contracts; one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended.
> In order to afford the remedy demanded by exact justice and adjust such remedy to a cause of action, the law sometimes indulges in the fiction of a quasi or constructive contract, with an implied obligation to pay for benefits received. The courts, however, employ the fiction with caution, and will never permit it in cases where contracts, implied in fact, must be established, or substitute one promisor or debtor for another.

*Cascaden v. Magryta*, 225 N.W. 511, 512 (Mich. 1929). The Michigan courts have explained that the equitable doctrine of unjust enrichment may provide the remedy for a claim of breach of an implied-in-law contract, or quasi-contract. *See, e.g., Kammer Asphalt Paving Co. v. East China Township Sch.*, 504 N.W. 2d 635, 640 (Mich. 1993). Further, the Michigan courts have held that where a party seeks to enforce an oral agreement, the court will equate "recovery under the equitable theory of contract implied in law with recovery in quantum meruit." *In re Estate of McKim v. Cornell*, 606 N.W. 2d 30, 33 (Mich. Ct. App. 1999).

Recognizing the importance of the distinction between contracts implied in fact and those implied in law, we held in *Taco Bell*:

> For the purpose of the preemption analysis, there is a crucial difference between a claim based on *quasi*-contract, *i.e.*, a contract implied in law, and a claim based upon a contract implied in fact. In the former, the action depends on nothing more than the unauthorized use of the work. Thus, an action based on a contract implied in law requires no extra element in addition to an act of

billboards along the Detroit highways; and that the artwork employed on its billboards wrongfully appropriated the style of the Artwork in plaintiffs' souvenir brochures. In other words, plaintiffs argue that WJR took their works and reproduced them, distributed them, publicly performed and displayed them, and made derivative works from them. Each of these actions would, in and of itself, infringe one of the exclusive rights set out in § 106; furthermore, no element either in addition to or instead of these actions is required to constitute the state law cause of action. We therefore conclude that plaintiffs' conversion claim satisfied the equivalency requirement of the preemption analysis and is preempted by the Copyright Act. *See also United States ex rel Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (finding conversion claim preempted); *Daboub v. Gibbons*, 42 F.3d 285, 290 (5th Cir. 1995) (same).

   b. *Unjust Enrichment and Quantum Meruit.* Plaintiffs denominate Count IV of the complaint "Unjust Enrichment," and Count V "Quantum Meruit." In Count IV, plaintiffs allege that WJR "was unjustly enriched as a result of Defendant's intentional and wrongful appropriation, and improper use of: (i) the original ideas and concepts contained in Plaintiff, Rosary Take-One's, feature motion picture; and (ii) Plaintiffs' proprietary ideas, concepts, strategies, and tie-ins for marketing and exploiting the feature film and the Musical Composition, including, but not limited to, the use of the Art Work." In Count V, the plaintiffs allege that WJR "was aware that Plaintiffs intended to be fully compensated in the event that Defendant desired to make use of Plaintiffs' original ideas, concepts, strategies, and tie-ins in any manner," and that WJR did, in fact, make use of those ideas, concepts, strategies and tie-ins by appropriating them without compensating plaintiffs.

   For at least 70 years, Michigan law has distinguished between contracts implied in law and contracts implied in fact:

   Next, we look to precedents from other jurisdictions that discuss the registration requirements under §411. Case law on this issue is sparse, but the majority rule appears to be that a separate registration is required for derivative works. For example, the Fifth Circuit held that the district court had no jurisdiction to consider a copyright holder's claim of infringement of its tee-shirt designs when it had registered only black and white line drawings of the designs and the tee-shirt designs were derivative works of the preexisting line drawings. *See Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997). Similarly, a district court in New York found that it had jurisdiction to consider plaintiffs' copyright infringement claim only because the plaintiffs registered the 1960 version of *Handyman* (a song) as a derivative work of the 1959 version of *Handyman*, thereby complying with the requirements of 17 U.S.C. §411. *See Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1153, 1159-60 (S.D.N.Y. 1986).

   We acknowledge that there are cases that permit infringement suits to proceed on registered derivative works even though some of the underlying foundational works were not formally registered. Those cases distinguish copyrighted material in which both the preexisting and derivative works are authored by the same person from works in which the authors are different. For example, the district court in Kansas has held:

   [A]n owner of a registered copyright in a derivative work does not have to register separately the preexisting work before bringing an infringement action based on the derivative work. The court finds that this result is consistent with the principles of the Copyright Act. First, Xerox is the author of the preexisting works and,

_____

*Jeanette* and *J.P.'s Theme*. But the question before this Court is whether the lack of a formal registration strips the federal court of jurisdiction to hear plaintiffs' claim that WJR has infringed the copyright in *J.P.'s Theme*. For the reasons discussed hereinafter, we conclude that it does.

therefore, copyright protection was extended as soon as the versions of the software and manuals were "fixed in any tangible medium of expression" without regard to registrations. Second, the Copyright Act does not require separate registration of each and every component part of a copyrighted work particularly where the author of the derivative work is the uncontested author of each of the component parts.

\* \* \*

Xerox's registration of the derivative works is sufficient to allow an infringement claim based on copying of material either newly added or contained in the underlying work.

*In re Indep. Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1469, 1473 (D. Kan. 1997) (internal citations omitted). Similarly, a district court in California concluded:

Where, as here, the author of a collection or derivative work is also the author of the preexisting work, registration of the collection is sufficient . . . . Here, Hubbard was the author of the underlying work and was also the author of the collection of his own works. Accordingly, registration of the collections that include the Exhibit A works constitutes registration of the underlying works.

*Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 923 F. Supp. 1231, 1241-42 (N.D. Cal. 1995).

These cases are reconcilable, however, with the rule that we adopt: before an infringement suit can be sustained based on the derivative work, that derivative work must be registered. These cases speak only to the circumstance in which it is the derivative work (or collection) that was registered and the preexisting work that was not. Because a derivative work is cumulative of the earlier work, it is logical that the registration of the derivative work would relate back to

them is the expression of an idea, which is the essence of the subject matter of the Act. Accordingly, we conclude that the subject matter requirement of the preemption analysis is satisfied.

2.   Equivalency Requirement

We held in *Taco Bell* that

"[e]quivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights. Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.

*Taco Bell*, 256 F.3d at 456. Each of plaintiffs' state law claims must be evaluated in light of this standard.

a. *Conversion*. The plaintiffs contend that WJR unlawfully converted plaintiffs' property, *i.e.*, the Song, the Line and the Artwork. Under Michigan law, conversion is defined generally as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Sarver v. Detroit Edison Co.*, 571 N.W.2d 759, 761 (Mich. Ct. App. 1997). The "gist" of a conversion claim is that the defendant has interfered with the plaintiff's control and use of its property. *See id.* at 762.

Plaintiffs' complaint alleges that WJR "did take, hold, and use for its own benefit the original ideas and concepts contained in the feature film, the Rosary Murders, as well as the proprietary ideas, concepts and strategies for marketing and exploiting the feature film and the Musical Composition." In summary, plaintiffs claim that WJR wrongfully incorporated the Song in the Recording and sold the Recording for profit; that it wrongfully displayed the Line on

[A] state common law or statutory claim is preempted if: (1) the work is within the scope of the 'subject matter of copyright,' as specified in 17 U.S.C. §§102,103; and, (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. §106.

*Id.* at 453. Therefore, to determine whether plaintiffs' state-law claims are preempted, we first must consider whether the Line, the Song, and the Artwork satisfy the subject matter requirement; second, we must consider whether the state law causes of action pled by the plaintiffs satisfy the equivalency requirement. Only if both requirements are satisfied will the state law claim be preempted.

Before we analyze the issue of preemption under the Copyright Act, we pause to emphasize that preemption in this case, as in any case of federal preemption of state law, is highly dependent upon the facts presented and the claims actually pled by the parties. With this in mind, we proceed to the specifics of plaintiffs remaining state law claims.

### 1.    Subject-Matter Requirement

There is no dispute that the Song is a work within the subject matter of copyright as it is defined in 17 U.S.C. §§301, 302. The Line and the Artwork, however, we have already determined are not amenable to copyright protection. But this determination does not dictate the conclusion that the subject matter requirement has not been satisfied. In *Taco Bell*, we agreed with the reasoning of those circuits which have held that "the scope of the Copyright Act's subject matter extends beyond the tangible expressions that can be protected under the Act to elements of expression which themselves cannot be protected." *Id.* at 455. We therefore held that "the scope of the Copyright Act's subject matter is broader than the scope of the Act's protections." *Id.* Here, although the Line and the Artwork lack the level of creativity necessary to come within the protection of the Act, each of

include the original work, while registration of the original material would not carry forward to new, derivative material.

We think that Congress intended the jurisdictional requirements of §411(a) to add clarity and certainty to the enforcement of copyrights; we therefore adopt the rule that a copyright owner must register its derivative works with the United States Copyright Office as a jurisdictional prerequisite to bringing a copyright infringement suit. In this case, the plaintiffs formally registered the original song, *Jeanette*, but failed to register the derivative work, *J.P.'s Theme*. Therefore, we hold that plaintiffs are barred from bringing a action for copyright infringement of the Song.

### C.    *Copyright Infringement of the Line and the Artwork*

The district court held that Laurel's claim of copyright infringement with respect to the Line and the Artwork was barred by the statute of limitations. However, because we conclude that neither the Line nor the Artwork is amenable to copyright protection at all, we decline to consider whether plaintiffs' claims are also barred by the statute of limitations.

"The *sine qua non* of copyright is originality . . . that it possesses at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). WJR argues that although the Movie, taken as a whole, warrants copyright protection, individual lines of dialogue are not automatically entitled to copyright protection. We agree with this position.

The Line is properly characterized as a phrase or slogan. The federal regulations[2] state that "words and short phrases such as names, titles, and slogans" are not subject to copyright protection. *See* 37 C.F.R. §202.1. In light of this regulation, the First Circuit considered whether certain phrases contained

_____

[2]These regulations are promulgated by the Register of Copyrights under the authority of 17 U.S.C. § 702.

in the plaintiff's marketing brochure were copyrightable. *See CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504 (1st Cir. 1996). In that case, a marketing firm had designed a call-in contest and certain publicity materials to promote the contest. The two phrases at issue were "if you're still 'on the clock' at quitting time" and "clock in and make $50 an hour." The Court rejected the marketing firm's argument that the phrases were subject to copyright protection. *See id.* at 1519 ("It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection."). The Court concluded that even though the plaintiff had obtained a copyright in the brochures containing the phrases, "copyright protection does not extend to [the phrases'] ordinary employment phraseology which lacks the minimal level of originality." *Id.* at 1520.

Similarly, in this case, plaintiffs obtained a copyright on the entire Movie, which contained the Line used by WJR in its advertising campaign. However, the Line is nothing more than a short phrase or slogan, dictated to some degree by the functional considerations inherent in conveying the desired information about McCarthy's morning show, *i.e.*, whose morning show, what radio station, and what time.

Neither is the Line a "readily recognizable" portion of the Movie as were the disputed lines considered by the court in *Universal City Studios, Inc. v. Kamar Industries, Inc.*, 217 U.S.P.Q. 1162, 1982 WL 1278 (S.D. Tex. 1982). In that case, the district court concluded that the lines "I love you, E.T." and "E.T. phone home!" spoken by E.T. in the film of the same name, were "readily recognizable to the lay observer as key lines of dialogue from the copyrighted movie and, therefore, the test for copyright infringement has been satisfied." *Id.* at 1166.

E.  *Preemption by the Copyright Act*

Laurel brings a number of state-law claims relating to WJR's use of the Song, the Line and the Artwork. As we discuss more fully below, we believe that each of plaintiffs' state-law claims has been preempted by §301 of the Copyright Act. *See* 17 U.S.C. §301.

Section §301 of the Copyright Act defines the scope of the Act's preemptive reach. In pertinent part, it provides:

(a) [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether [ ... ] published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or [ ... ]

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. §301.

As we explained in our recent decision in *Wrench LLC v. Taco Bell*, 256 F.3d 446 (6th Cir. 2001):

his gift explicit, and his subsequently allowing WJR to play the Song without objection for nearly five years. Because the confusion argued by plaintiffs is not confusion by consumers, which is what the Lanham Act was enacted to protect against, the defendants' actions did not violate the Lanham Act. *See generally Agee*, 59 F.3d at 327.

Plaintiffs also bring a claim of unfair competition under Michigan state law.[5] The analysis of a claim under Michigan's law of unfair competition is similar to the analysis of a federal Lanham Act claim. *See Two Men and a Truck/Int'l, Inc. v. Two Men and a Truck/Kalamazoo, Inc.*, 949 F. Supp. 500, 503 (W.D. Mich. 1996). Thus, for the same reasons described above, plantiffs have failed to set forth a state-law claim of unfair competition.

Furthermore, under Michigan law, generally there can be no unfair competition when the parties are not competitors in the marketplace. *See Boron Oil Co. v. Callanan*, 213 N.W.2d 836, 838 (Mich. Ct. App. 1973). The exception to that rule occurs when the a party has "an outstanding and widely known name, made valuable by the owner" and the name is pirated by another party. *Id.* Plaintiffs argue that because the Movie is so well known and the Line and Song are so familiar to the public, WJR's use amounts to unfair competition. At the same time, plaintiffs admit their business interests do not in any way compete with WJR's interests. Plaintiffs take an untenable position. Even if the exception for well-known trade names were applicable in this situation, a very doubtful proposition, plaintiffs have presented no evidence to support the claim that the contents of the Movie were so well known in the community as to invoke the exception.

---

[5] While it is possible that plaintiffs' state-law unfair competition is preempted by the federal Copyright Act, we decline to address this question as we believe plaintiffs' complaint fails to state a claim of unfair competition under Michigan state law.

WJR contends that unlike the lines in *Kamar Industries*, the Line in dispute here is a minor part in the overall Movie, and that this fact alone is fatal to plaintiffs' claim of copyright infringement. The misappropriation of even a small portion of a copyrighted work, however, may constitute an infringement under certain circumstances. *See Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 361 (9th Cir. 1947) ("'To constitute an invasion of a copyright it is not necessary that the whole of a work should be copied, nor even a large portion of it in form or substance, but that, if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute an infringement.'"). However, when a single line of a larger copyrighted work is appropriated by an alleged infringer, the test is whether "the work is recognizable by an ordinary observer as having been taken from the copyrighted source." *Id.* (internal quotation marks omitted); *see also Whitney v. Ross Jungnickel, Inc.*, 179 F. Supp. 751, 753 (S.D.N.Y. 1960) ("Here, only two lines are claimed to have been appropriated from plaintiffs' lyric, . . . This would not prevent recovery if the lines claimed to have been appropriated constitute an important and vital part of the two compositions rather than being merely incidental or trivial.").

In this case, it is clear that the disputed Line spoken by McCarthy was not an integral part of the Movie; it was merely an incidental part of the background. Moreover, the Line does not come even close to being as "readily recognizable" in terms of its relationship to the Movie as "E.T. phone home" is to its movie source. We conclude that the Line is an insignificant part of a much larger work and it is a phrase or slogan not worthy of copyright protection in its own right; therefore there can be no infringement in this case as a matter of law.

As to plaintiffs' alleged copyright in the Artwork, we fail to see how a second-grader's handwritten rendition of the Ten Commandments embodies any degree of creativity that would

render the resulting work amenable to copyright protection. There is no evidence in the record that the children were asked to create an artistic rendition; the assignment was merely to copy the text of the Ten Commandments in the children's own handwriting. The result was nothing more than words and phrases, long since dedicated to the public domain, rendered in juvenile penmanship.[3] Because there is nothing in the Artwork that is copyrightable, plaintiffs' infringement claims as to the Artwork must also fail as a matter of law.

D.   *The Lanham Act and Unfair Competition under Michigan State Law*

The Lanham Act creates a cause of action against "[a]ny person who . . . uses in commerce . . . any false designation of origin . . ., which is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin . . . of . . . goods, services, or commercial activities by another person."  15 U.S.C. §1125(a)(1)(A).  In order to prevail on a claim under the Lanham Act, plaintiffs must prove both a false designation and public confusion.

Plaintiffs claim that WJR's use of the Line and Artwork on its billboards and the Song on the Recording without giving Laurel credit is a false designation of origin and therefore violates the Lanham Act.  The Second Circuit has considered this precise question and rejected plaintiffs' argument based on the second prong of the analysis—public confusion. *See Agee v. Paramount Communications, Inc.*, 59 F.3d 317 (2d Cir. 1995).

In *Agee*, the court considered *Hard Copy*, a television program which used a copyrighted song in its program

---

without the author's permission and without crediting the author for the composition.  The author argued a violation under the Lanham Act because the producer "misrepresented the source of the recording or at least suggested that it owned a copyright in the recording." *Id.* at 327.  The Court rejected the claim because there was no evidence that the broadcast was intended to deceive the public, nor was there any factual evidence that the public was actually confused. *See id.*  Just as in this case, the author in *Agee* was seeking compensation because he did not receive credit for composing the work. The Second Circuit rejected an extension of the Lanham Act to cover circumstances where an artist had not received proper credit, commenting that doing so "would simply transform every copyright action into a Lanham Act action as well." *Id.* (citing *Merchant v. Lymon*, 828 F. Supp. 1048, 1060 (S.D.N.Y. 1993)).[4]

We find *Agee* persuasive authority on facts substantially similar to those presented by this case.  Here, it is undisputed that no one was falsely credited for writing the Song or the Line.  More to the point, plaintiffs have not submitted any evidence of public confusion attributable to the fact that the Song was included in the Recording or that the Line and Artwork were used on the billboards.

Plaintiffs do not seriously claim that they have presented any evidence of consumer confusion regarding the Song, Line, and Artwork.  Instead, plaintiffs argue that the fact that WJR employees believed WJR owned the Song is sufficient evidence of confusion.  There was undoubtedly confusion surrounding the extent of WJR's permission to use the Song, but that confusion was not caused by WJR's inclusion of the Song on the Recording.  It was caused by Laurel's haphazard "gift" of the Song to McCarthy, without making the terms of

---

[3]In reaching this conclusion, we do not mean to trivialize the sanctity of the words of the Ten Commandments.  We simply conclude that no one may claim a copyright in that text, and nothing about this depiction of that text is sufficiently creative to warrant copyright protection.

[4]We do not consider *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 781 (2d Cir. 1994) as denigrating the holding in *Agee*, because in *Waldman* the author's name was substituted for that of the actual author.  Those were not the facts in either *Agee* or the instant case.